In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-3838, 10-3840, 11-1098

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUSTIN CEPHUS, JOVAN D. STEWART, and
STANTON L. CEPHUS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:09-cr-00043-RL-PRC—**Rudy Lozano**, *Judge*.

ARGUED MAY 30, 2012—DECIDED JULY 6, 2012

Before EASTERBROOK, *Chief Judge*, and BAUER and
POSNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendants were tried to-
gether for conspiring to entice underage girls, often
runaways, to engage in prostitution, to transport them
(along with adult women who also worked for the ring)
in interstate commerce to engage in prostitution, to

use force and fraud to coerce adult women to engage in prostitution, and to commit related offenses. The defendants were also charged with the underlying offenses. See 18 U.S.C. §§ 1591, 2421, 2423. The jury convicted all three defendants on all counts. The judge sentenced both the ringleader, Justin Cephus, and Jovan Stewart to life in prison (without parole, which has been abolished in federal sentencing) and Justin's brother Stanton Cephus to 324 months in prison.

The facts are simple and largely uncontested—and indeed incontestable. Justin Cephus inveigled dozens of girls and young women into joining his "escort" agencies, assuring them that if they didn't want to engage in sex with the agencies' customers they could just answer the phone or drive other girls to "calls" (sexual assignations). Those who went on calls were told they could keep a portion of the money paid by the johns. But usually Cephus (unless otherwise indicated, all references in this opinion to "Cephus" are to Justin Cephus) would appropriate the entire fee. Any resistance to his orders, which included orders to have sex with customers even if the girl or woman didn't want to, were met with threats, and with violence in the form of whipping, beating, or choking. One woman he beat with his fists, an extension cord, a dog bar (we don't know what "dog bars" are—we're guessing they're metal bars for dog cages), and a broomstick, which he broke on her back. When the beating was over, she looked, according to a witness to the beating, "like she got hit by a train." The defendants operated out of northwest Indiana and often transported

their prostitutes across the state line to Illinois to answer "calls."

The defendants argue that the indictment was "duplicitous." In ordinary English the word means "intentionally deceptive." But it is used in the law to characterize an indictment that charges two or more different offenses in a single count. E.g., *United States v. Hassebrock*, 663 F.3d 906, 916 (7th Cir. 2011); *United States v. Pungitore*, 910 F.2d 1084, 1135 (3d Cir. 1990). And why is that bad? Because a "jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both. Adverse affects [*sic*] on a defendant may include improper notice of the charges against him, prejudice in the shaping of evidentiary rulings, in sentencing, in limiting review on appeal, in exposure to double jeopardy, and of course the danger that a conviction will result from a less than unanimous verdict as to each separate offense." *United States v. Marshall*, 75 F.3d 1097, 1111 (7th Cir. 1996), quoting *United States v. Blandford*, 33 F.3d 685, 699 n. 17 (6th Cir. 1994).

The defendants did not contend in the district court that any of the counts were duplicitous, and having shown no good excuse ("good cause") for the oversight they have waived the issue, Fed. R. Crim. P. 12(e), and so are barred from arguing even "plain error" in our court. *United States v. Acox*, 595 F.3d 729, 731-34 (7th Cir. 2010); *United States v. Walker*, 665 F.3d 212, 227-28 (1st Cir. 2011). Anyway none of the counts was likely to be thought duplicitous by the jurors. The first alleged the conspiracy and

described as acts in furtherance of it the acts charged as substantive violations in the 20 subsequent counts. Each of those counts first "incorporated by reference" the allegations in the first count and then alleged a substantive violation of the federal criminal code. Only if read literally would each count be alleging two offenses: conspiracy and a substantive offense. No reasonable person would read them literally. None of them mentions conspiracy. A normal reader would understand each subsequent count's invocation of the first count to mean that the substantive offense alleged (identified in the count by the section of the federal criminal code that created the offense) in the subsequent count was one of the offenses the defendants had conspired to commit. The jury was instructed that a "verdict of guilty or not guilty of an offense charged in one count should not control your decision as to that defendant in any other count." A reasonable juror would not understand this to mean that having decided that the defendants were guilty of count one he would *have* to decide they were guilty of the other 20 counts as well because each of those counts mentioned the charge of conspiracy.

So much for duplicity. Stanton Cephus argues (alone among the three defendants) that the evidence of his guilt was insufficient to convict him. He argues that he had just helped out his brother from time to time, motivated by family loyalty. But an innocent or even noble motivation for committing a crime, as distinct from lack of intent to commit it, is not a defense. *United States v. Cullen*, 454 F.2d 386, 390-92 (7th Cir. 1971); *United States v. Rosado,* 728 F.2d 89, 93 (2d Cir. 1984); 1 Wayne R. LaFave, *Substantive*

*Criminal Law* § 5.3, pp. 358-64 (2d ed. 2003). A person prosecuted for mass murder for having blown up a packed 747 in flight could not defend by testifying however convincingly that his motive had not been to kill anyone, though he knew that to be an inevitable consequence of the bombing, but to save lives in the long run by inducing greater efforts at preventing terrorist attacks. *United States v. Snow*, 670 F.2d 749, 753-54 (7th Cir. 1982); *United States v. Cullen, supra*, 454 F.2d at 389-90; *United States v. Platte*, 401 F.3d 1176, 1180-81 (10th Cir. 2005); *United States v. Kabat*, 797 F.2d 580, 587-88 (8th Cir. 1986). Although Stanton didn't commit all the substantive offenses charged in the indictment, he participated in the conspiracy by driving girls and women to their "calls" and collecting money from the johns for his brother. He did not beat any of the prostitutes but he watched them being beaten and so was aware of the scope of the conspiracy he had joined. The *Pinkerton* doctrine therefore made him liable for criminal acts committed by the other conspirators within that scope. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *United States v. Colon*, 549 F.3d 565, 572 (7th Cir. 2008).

All the defendants complain strenuously about the government's frequently posing leading questions to its witnesses. The judge sustained many of the objections and criticized the government repeatedly. A leading question is a question phrased in such a way as to hint at the answer the witness should give. Jas Brar, Note, "Friend or Foe? Responsible Third Parties and Leading Questions," 60 *Baylor L. Rev.* 261, 264-67 (2008). The question is calculated to "lead" the witness to the answer desired by the lawyer.

There is no blanket prohibition of such questions. They are permissible when used against adverse witnesses, usually in cross-examination, or when used with friendly witnesses to move direct examination along rather than to elicit testimony damaging to the opposing party that the witness might not have given in response to a neutral question. Fed. R. Evid. 611(c).

The judge was too hard on the prosecution. He should not, for example, have sustained the objection by Cephus's lawyer to the following question asked one of the prostitutes by the prosecutor: "Did he [Cephus] ever tell you what P-I-M-P stood for?" That was not a leading question. "Did Cephus ever tell you that P-I-M-P stands for 'power in manipulating pussy'?" would have been a leading question, but it was not asked. Eventually, after a protracted sidebar, the judge relented and allowed the prosecutor to ask the question in a different form, eliciting at last the answer that Cephus had told the witness that "PiMP" was indeed an acronym for "power in manipulating pussy." Similarly the prosecutor was not leading when he asked a witness: "Did you ever have a phone conversation when someone else was listening in?" The question did not signal the answer the lawyer expected or hoped for, in contrast to asking: "Didn't you *ever* have a phone conversation when someone else was listening in? Think carefully before answering." Or: "Isn't it true that you sometimes have phone conversations when some-one else is listening in?"

An objectionably leading question asked a friendly witness was the prosecutor's asking one of the girls

whether one of her first two "calls" took place in Illinois—a question designed to establish that she had been transported across state lines to engage in prostitution, because she was living in Justin Cephus's home in Indiana. She responded that both calls were in Indiana (thus indicating that she hadn't been "led" by the question) but that later she had calls in Illinois as well. The question was improper, but innocuous because it failed to lead her and because there is no dispute that she had calls in both states.

To one of the witnesses the prosecutor said: "You mentioned that he [Cephus] had a cord. Was he whipping her with the cord?" She answered "yes." Since whipping a person is unusual, the question would be unlikely to be asked unless an affirmative answer was expected. The question may also have been loaded (a loaded question is a question that contains an assertion, the classic example being "When did you stop beating your grandmother?"), as it might have been understood to mean: "Was he whipping her with a cord or something else?" Instead of mentioning whipping the prosecutor should just have asked her what she had seen Cephus doing with the cord.

The prosecutor asked other inappropriate leading questions, and sustaining objections to questions is probably not a very effective way of pulling their sting, because jurors can guess the answer that the interrogating lawyer expects to a leading question—that's the nature of such a question. But the leading questions in this case could not have affected the verdict of a reasonable jury, given the overwhelming evidence of the defendants' guilt.

Rule 412(a)(1) of the federal evidence rules provides that in a case involving allegations of sexual misconduct, "evidence offered to prove that a victim engaged in other sexual behavior" is inadmissible. (The prostitutes working for Cephus were engaged in criminal activity, but they were also his victims.) If admissible, such evidence would deter many victims of sexual abuse from testifying, as mentioned in the Committee Note to 1994 Amendments to Rule 412. There are exceptions to the exclusion, but the only one argued by the defendants is "evidence whose exclusion would violate the defendant's constitutional rights," Fed. R. Evid. 412(b)(1)(C), namely a defendant's right to confront the witnesses against him. Specifically the defendants wanted to cross-examine one of the adult call girls in Cephus's stable (Cassandra by name) about her having worked as a prostitute before he recruited her. They wanted to suggest that having already been a prostitute she would not have been deceived by Cephus and therefore her testimony that she was coerced into working for him—an element of one of the charged offenses when the prostitute is not a minor, 18 U.S.C. § 1591(a)—should be disbelieved. But the testimony sought to be elicited by the cross-examination would have been irrelevant. Even if no promises were made to Cassandra, this would not be evidence that she consented to be beaten and to receive no share of the fees paid by the johns she serviced. And even if she knew going in, from her prior experience, that Cephus probably would beat her, it was still a crime for him to do so. And finally the fact that she'd been a prostitute before does not suggest that he didn't beat and threaten her—that was his *modus*

*operandi* and there's no evidence that he would have made an exception for Cassandra.

The defendants also argue that her testimony that she'd seen Cephus beat a dog—and that the next morning the dog was seen hanging, dead, from a cord in the garage and that Cephus and Stewart joked about the beating and killing of the dog—was both irrelevant and prejudicial, and on both grounds should have been excluded from the trial. Fed. R. Evid. 402, 403. The evidence was relevant to show a method by which Cephus coerced his recruits into obeying his illegal commands and was not unduly prejudicial in light of the extensive evidence that Cephus beat women who worked for him.

A witness who had once worked for him but hadn't seen him for three years before the trial could not identify him in the courtroom. So she was shown photographs taken around the time she had last seen him and she identified him from those photos. The photos were mug shots, and, the defendants argue, prejudiced the jury by revealing that Cephus had been arrested at least once before his arrest for the crimes for which he was being tried. But there was nothing in the photos to distinguish them from ordinary head-and-shoulders shots, and neither the witness nor the jury was told they were mug shots. There was thus no error in allowing them to be used to identify Cephus as the man she had worked for.

The defendants challenge their sentences. Cephus and Stewart contend that life sentences without parole

violate the cruel and unusual punishments clause of the Eighth Amendment unless the crime for which the sentences are imposed is murder. Yet *Harmelin v. Michigan*, 501 U.S. 957 (1991), upheld a life sentence without possibility of parole for possession of a modest quantity of cocaine. Subsequently the Court held that the Eighth Amendment forbids imposing a life sentence without parole on a juvenile for a crime other than murder, *Graham v. Florida*, 130 S. Ct. 2011, 2030 (2010), and, more recently, that mandatory life sentences for juvenile murderers are also prohibited. *Miller v. Alabama*, 2012 WL 2368659 (S. Ct. June 25, 2012). Neither opinion overrules *Harmelin*; both, indeed, distinguish it explicitly. Our defendants were not juveniles and their crimes were more serious than the crime in *Harmelin*. Even if we thought *Harmelin* inconsistent with *Graham* and *Miller* and likely to be overruled, the Supreme Court has, as we noted recently in *Grayson v. Schuler*, 666 F.3d 450, 453 (7th Cir. 2012), told the lower courts in no uncertain terms to leave the overruling of its precedents to it.

Stanton Cephus's argument that his 324-month sentence is grossly disproportionate to his role in the offenses is frivolous, and that brings us to the last issue: whether defendant Stewart is entitled to a remand because of an ambiguity in his sentence. At the sentencing hearing the judge imposed life sentences on him on seven counts for which the jury convicted him, and on the other seven counts of conviction imposed sentences ranging from 5 to 10 years. The judge added that the sentences are "all to be served consecutively to each other." The written judgment, however, states that all the sentences are "to be served concurrently."

What the judge says in sentencing a defendant takes precedence over the written judgment. *United States v. McHugh*, 528 F.3d 538, 539 (7th Cir. 2008); *United States v. Daddino*, 5 F.3d 262, 266 and n. 5 (7th Cir. 1993) (per curiam) (citing cases from other circuits). This seems an odd rule. As remarked in *United States v. Weathers*, 631 F.3d 560, 561-62 (D.C. Cir. 2011), "If the concern is with accuracy, one wonders why a court's oral pronouncement of a sentence would ever take precedence over its written judgment. It is commonly understood that the written word is usually more precise than the spoken word. The writer can be more deliberate and careful in his choice of language, he can edit his writing before publishing it and he may have more time to formulate what he wishes to convey . . . . Yet the law is settled that the oral sentence controls . . . . One supporting theory is that the defendant has a right to be present at sentencing and that permitting the written judgment to control would be tantamount to sentencing the defendant *in absentia*." That's a pretty thin theory. No matter; the rule is well settled.

Yet it's hard to make sense of sentencing a defendant to consecutive sentences some of which are life sentences without possibility of parole and the others term sentences. Imprisonment for life without parole can neither exceed nor fall short of the prisoner's life, and therefore the fact that term sentences are to run consecutively, or for that matter concurrently, with a life sentence cannot—one might think—affect the length of imprisonment. But this is not quite correct. Suppose that Stewart mounts a collateral attack on his life sentences and succeeds in getting all of them vacated, but not

the term sentences. Then it would make a difference whether the term sentences ran consecutively to one another or concurrently; in the latter event the total period of imprisonment would be shorter.

Maybe it was because of this possibility that the judge made all the sentences run consecutively to each other. But he didn't say this, and his intentions are sufficiently muddy in light of the written judgment (which may have been intended to correct a slip of the tongue at the sentencing hearing, rather than being a clerk's error) to move us to remand for clarification. See *United States v. Spells*, 537 F.3d 743, 754-55 (7th Cir. 2008); *United States v. Hopson*, 39 F.3d 795, 803 (7th Cir. 1994); *United States v. Jewel*, 947 F.2d 224, 234-35 (7th Cir. 1991). For "when an orally pronounced sentence is ambiguous, . . . the judgment and commitment order is evidence which may be used to determine the intended sentence." *United States v. Villano*, 816 F.2d 1448, 1451 (10th Cir. 1987) (en banc).

The ambiguity in the judge's oral sentence in this case was extrinsic—"latent" as distinct from "patent," the latter meaning that the ambiguity is apparent from the text, without the reader's having to delve into the circumstances, the former that the ambiguity emerges only when the circumstances surrounding the creation of the text are considered. Cf. *Knutson v. UGS Corp.*, 526 F.3d 339, 342 (7th Cir. 2008); *Utica Mutual Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 712-13 (7th Cir. 2004); *Charter Oil Co. v. American Employers' Ins. Co.*, 69 F.3d 1160, 1167-68 (D.C. Cir. 1995). But as in contract law so in sentencing, a latent ambiguity invites further inquiry.

It's true that the Bureau of Prisons, in deciding how long to imprison a person who has been sentenced to federal prison, looks to the written judgment. U.S. Department of Justice, Federal Bureau of Prisons, *Legal Resource Guide to the Federal Bureau of Prisons* 10 and n. 5 (2008); *Wilkins-El v. Marberry*, 340 Fed. Appx. 320, 321 (7th Cir. 2009) ("The Bureau of Prisons ordinarily implements written judgments, not oral pronouncements"). But that's just for the convenience of the Bureau's staff, to spare its having to read the transcript of the sentencing hearing: "no matter what form was used to memorialize this . . . sentence, the BOP must read it as intended and pronounced by the sentencing court." *Id*. at 323. Yet, it might seem that since Stewart's written judgment is more lenient than the spoken one, he has nothing to gain from challenging it by seeking a remand. But we can't be certain of that. Again suppose that in a collateral proceeding Stewart's life sentences are voided and he is resentenced; the judge might follow his original oral pronouncement (if we had not questioned it) and make the term sentences consecutive; and the Bureau of Prisons would be bound. So Stewart's judgment should be remanded to enable the district judge to reconcile the discrepancy between his written and oral sentences.

In all other respects the judgments are affirmed.