In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3421

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MCKENZIE J. CARSON,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 918 — **Elaine E. Bucklo**, *Judge*.

ARGUED DECEMBER 6, 2016 — DECIDED AUGUST 29, 2017

Before WOOD, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*. A jury convicted McKenzie Carson of four counts of violating the federal sex trafficking statute. Three of those counts alleged that Carson engaged in sex trafficking with knowledge that the victims were forced, threatened or coerced. The other count alleged that Carson was involved in the sex trafficking of a person under the age of eighteen. He asks this court to reverse his conviction and

remand for a new trial, claiming that he was prevented from eliciting relevant testimony from his victims, that he was precluded from effectively cross examining a key witness, that the district court errantly admitted evidence of uncharged "bad acts," and that he was prejudiced by incorrectly worded jury instructions. We find no reversible error and thus affirm the decision of the district court.

## I.

Toward the end of 2009, Kaitlin Fratto's neighbor, Christopher Richardson asked her if she would be interested in working in an escort business run by his acquaintance, McKenzie Carson. Fratto, although only seventeen years old, was in need of money and expressed interest in the job. Richardson brokered a meeting, but not before telling Carson that Fratto was seventeen, as he worried that both of them could get "into potentially a lot of trouble" if Fratto worked as an escort while a minor. Tr. 12/2/13 at 165 (R. 161, pageID 1495). Richardson drove Fratto to a Motel 6 in Joliet to meet Carson, reminding him again that Fratto was seventeen. Despite the warning, Carson asked Fratto to remove her clothing, took her to the bathroom and raped her, threatening to kill her if she told anyone. After the rape, another woman, Katie Smego arrived, and the four left for another hotel where Carson took provocative photographs of Fratto and Smego, including some in which the two were naked. Carson used the photographs to post advertisements for prostitution services on the website Backpage.com.

In the two day period after Carson posted the advertisements, Carson arranged one commercial sex transaction for Fratto and two for Smego. He also arranged to have another man take more photographs of Fratto for additional adver-

tisements on Backpage.com. As the photographs were being taken, Richardson reminded Carson that Fratto was only seventeen. After the photo session, Richardson drove Fratto to and from three or four more commercial sex transactions that night. Carson directed Richardson where to deliver the money Fratto earned, but when Richardson insisted that some of the money was his, a heated argument ensued in which Carson told Richardson that if Richardson did not bring both Fratto and the money back to him, "I'll kill you, I'll kill your kids, I'll kill your family." Tr. 12/2/13 at 183 (R. 161, pageID 1513). Richardson relayed the threats to Fratto who stayed with Richardson instead of returning to Carson. Carson continued to call throughout the night, issuing more threats and threatening to kill Fratto if he did not get his money, and at one point telling Fratto that he had killed Smego.

Eventually Fratto agreed to continue working for Carson, during which time she traded sex for money three or four times a day. During the time Carson was trafficking Fratto, he flattered her by telling her she was "his top notch bitch," that she was pretty, and would get rich modeling. Tr. 12/3/13 at 410–11 (R. 162, pageID 1740–41). He also tried to isolate Fratto from her mother, took her battery out of her phone and told her "he didn't want [her] talking to nobody, and he didn't want nobody to know where [she] was." *Id.* at 403 (R. 162, pageID 1733).

Fratto testified that she told Carson that she was seventeen and even showed him her identification card. In response, she testified that he said, "it was alright, that [they] would just have to keep it under the radar until [she] turned 18." *Id.*

Unlike Fratto, the remaining three victims were not mi-
nors, but they were easily manipulable for other reasons. All
of them were long-time drug addicts, homeless, desperate
for drugs and had nowhere to go.

Veronica Del Valle was in just such a desperate state
when she met Carson. She testified that she had been using
crack cocaine since the age of twelve, and at the height of her
addiction any interruption left her throwing up, sweating,
unable to sleep and eat. In late 2009 and early 2010 she was
living in a crack house when another woman suggested she
could work as a prostitute for Carson. On two occasions in
2010 Del Valle left the crack house with Carson who took her
to a hotel, took seductive pictures of her for advertisements
he posted on Backpage.com and supplied her with drugs. In
the summer of 2010, he located her at the crack house again,
bought her drugs and convinced her to work as a prostitute,
promising that she would keep the money she earned and
that she could decide for herself when she wanted to work.
Del Valle ended up working for Carson for five to six
months, engaging in commercial sex transactions up to as
many as five times a day, staying with Carson at hotels, and
using drugs that he provided for her.

Del Valle testified that Carson took most of her money,
took away her personal cell phone and gave her a phone she
could use for "business" only. He checked her phone regu-
larly to see if anybody out of the ordinary was calling her
and told her he would use the phone's GPS to find her,
which, in fact, he did one night when Del Valle tried to
leave. Using the GPS to track her, he ran up and down a
street at 3 a.m. screaming her name. He also took away her
shoes and clothes to keep her from leaving the hotel where

she stayed. But that was not enough control for Carson. He beat her with belts, slapped her face, anally raped her, gave her black eyes and cut lips and told her that if she "were to leave, he would kill [her] grandmother and [her] children." Tr. 12/4/13 at 548 (R. 163, pageID 1879).

Like Del Valle, Jessica Sikora was a heroin addict who experienced severe withdrawal—vomiting, sweating, and pain—when she stopped using heroin. Sikora testified that she too met Carson in 2010 when she was homeless. When another woman told Sikora that Carson could get her a job and a place to live, Sikora got into a car with Carson who took her straight to Chicago's west side to buy her heroin and then to a hotel where she met Del Valle. Carson promised he could "hook [her] up with dates," that she would make money, he would buy her drugs, cosmetics, anything she needed, and give her a place to stay. Sikora knew she had nowhere to go and decided to stay. What she did not count on was the fact that Carson would require her to give him all of the money she earned, ordering her to strip naked so she could not hide money; that he would beat her with his hands, with a belt, with an extension cord; that he would hold a knife to her throat; and rape her orally, vaginally and anally, including one time while a woman and her newborn child watched. At one point, when she said she was too tired to work, Carson punched her in the eye leaving her with a permanently broken blood vessel.

Nahrin Lazzar's story was nearly the same. She became addicted to heroin at 16 and was homeless in 2010 when Sikora introduced her to Carson. She testified that she agreed to join Carson's business because she was homeless, had no money, no food and was suffering from withdrawal symp-

toms and needed drugs. As was the case with the others, Carson bought her drugs, brought her to a hotel room, and placed advertisements for her sexual services on Backpage.com. But in Lazzar's case, the physical violence began immediately. Shortly after arriving, Carson became upset with Lazzar and whipped her with a belt, leaving her back and buttocks "red and puffy with slash marks." Tr. 12/4/13 at 614 (R. 163, pageID 1945).

Carson required Lazzar to give him all the money she earned, and when she once tried to hide $100 in her pants, Carson whipped her with a belt and orally raped her. He then showed Lazzar a photograph of a buttocks with belt marks and welts and threatened her saying, "What I did to you is nothing [compared to] what I can do to you." Tr. 12/5/13 at 895–96 (R. 164, pageID 2226–27). Lazzar also testified that Carson supplied her with drugs but sometimes withheld them from her so she would get ill from withdrawal. Throughout her time with Carson, he beat her, whipped her, and raped her orally, vaginally and anally.

Lazzar eventually escaped from Carson by telling one of her clients about her circumstances and asking for a ride to Chicago. She left barefoot because Carson had taken her shoes. The night she left, Carson called her at least ten to twenty times.

In addition to the testimony described above, the jury also heard from Margaret Hurley, who testified that from January through March 2010, Carson paid her to drive the women to their commercial sex transactions and retrieve drugs for them. She also testified that she saw Carson beat his victims, including Del Valle. Hurley testified that, as with the other women, Carson took pictures of her that he

posted in advertisements on Backpage.com, but she never testified that she worked as a prostitute for Carson.

The government also called Dr. Sharon Cooper, a sex trafficking expert who helped explain how the desperate situations in which victims find themselves make them easy targets for sex trafficking. Cooper testified that sex traffickers select victims who demonstrate vulnerabilities including homelessness, substance abuse, mental health issues, and histories of physical, emotional or sexual abuse. A typical trafficker recruits victims by telling them that he loves them, promising them a better life, providing them with shelter and drugs, and lying to them about the nature of the job. Traffickers often use one victim to recruit other victims as victims are more likely to trust someone of a similar age and gender than a stranger of the opposite gender.

Cooper testified that traffickers control their victims through physical violence, sexual violence, psychological violence and grooming. Traffickers, she testified, groom victims with promises and compliments, but escalate to physical abuse, sexual assault and death threats. Often the trafficker will abuse a more experienced prostitute while younger victims watch. They also use psychological violence such as tearing a victim down, telling them they are worthless, socially isolating them, and controlling them financially and by taking advantage of a victim's drug dependency. Cooper noted that traffickers tend to be more violent with adult women because children and minors are far easier to intimidate.

Importantly for this case, and for a general understanding of the complexity of trafficking in general, Cooper explained that victims often stay with their traffickers—or

leave and then return—because they believe they have nowhere to go; that there is no one else out there for them, and no other options for them; they feel ashamed and guilty and stigmatized, thinking that they will not be accepted elsewhere. They are also afraid that if they leave, the trafficker will find them and harm them even more egregiously.

Given the testimony of Dr. Cooper, it was not surprising that the jury heard testimony that could be construed as evidence that the victims had chosen their lot. For example, the jury heard evidence that Fratto and Del Valle both left Carson and then returned, and that at times both could have left but did not do so. The jury heard evidence intended to convince them that these women willingly agreed to work as prostitutes. But whether they willingly agreed to essentially become enslaved—that is, to turn over all of their money and freedom and suffer abuse—is another question, and the one at the heart of the sex trafficking statute, of course. Del Valle, for example, testified that she had the combination to the safe where Carson kept her earnings, but that Carson had threatened that he would kill her if she took the money without permission. They also heard that some of the women called themselves girlfriends of Carson and used terms of endearment with him, although Del Valle, for example, said she merely "played the role" and "acted like [she was] his girlfriend" because it made her life easier. Tr. 12/4/13 at 671 (R. 163, pageID 2002). And they heard plenty of evidence of victims who did not want to leave Carson because he fed their heroin addictions, kept them from overdosing, gave them a place to stay, and paid for their food and other needs. The jury also heard evidence of women who turned to Carson for emotional support—to figuratively bail them out of difficult situations and literally bail them out of jail. But all

of this evidence is not inconsistent with coercion and force. Victims of sex trafficking may make decisions that look voluntary at times due to the incredible weight of coercion and force upon them. And they may make some decisions along the way that are truly voluntary. Those decisions do not take away from the fact that they have been held hostage, coerced, forced, or threatened to engage in commercial sexual acts. Sometimes that coercion and force may be subtle, leading a fact-finder to have to decipher whether the *mens rea* has been met. But this is not such a case. There is nothing subtle about rape, beatings, death threats, and taking women's clothes and phones so that they cannot readily escape. Carson kept these victims under his control by using a tightly woven web of rape, physical assault, threats, manipulation, isolation, and fear.

The jury convicted Carson on all four counts of violating the federal sex-trafficking statute, and Carson had the opportunity at sentencing to submit expert testimony about his Bipolar I Disorder, his problems with drug abuse, and his abusive family background. Despite Carson's submissions, the district court sentenced Carson to forty-seven years' imprisonment and five years of supervised release on each count, with the sentences to run concurrently. The court sentenced Carson below the Sentencing Guideline recommendation of life and below the government's recommended 55-year sentence.

## II.

The federal sex trafficking statute under which Carson was indicted reads as follows:

    **(a)** Whoever knowingly—

in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

The government charged Carson with trafficking Fratto under both the coercion and age provisions. Counts 2–4 charged Carson with trafficking Lazzar, Sikora and Del Valle under the coercion provision.

## A.      Evidence of victims' prior acts of prostitution.

Before the trial, the government moved to exclude evidence of or testimony regarding the victims' sexual histories and prior prostitution activities, arguing that such evidence should be excluded under Federal Rules of Evidence 412 and 403. Rule 412, often referred to as the "rape shield law" states:

> **(a) Prohibited Uses.** The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:
>
> **(1)** evidence offered to prove that a victim engaged in other sexual behavior; or
>
> **(2)** evidence offered to prove a victim's sexual predisposition.

**(b) Exceptions.**

**(1) Criminal Cases.** The court may admit the following evidence in a criminal case:

**\*\*\***

**(B)** evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and

**(C)** evidence whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412. Federal Rule of Evidence 403 is the general rule that: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Before the district court, Carson argued that evidence of his awareness of the victim's past prostitution had a direct bearing on his defense, that he subjectively believed that the women were not coerced into engaging in commercial sex acts, but rather did so willingly. The district court rejected Carson's argument, relying on our prior decision in *United States v. Cephus*, 684 F.3d 703 (7th Cir. 2012) and noting, that "whatever happened before, that really doesn't focus on whether somebody was beaten or coerced by this defendant." Tr. 11/19/13 at 33 (R. 179, pageID 33). We give district courts much deference in their evidentiary decisions, reversing only for an abuse of discretion. *Jackson v. Willis*, 844 F.3d

696, 701 (7th Cir. 2016). "And even if the district court erred in excluding evidence, '[a] new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice.'" *Arrigo v. Link*, 836 F.3d 787, 794 (7th Cir. 2016) (citing *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009)).

The evidence that Carson wished to introduce at trial is classic propensity evidence—that is evidence that the women had been prostitutes before made it more likely that they had voluntarily consented to these acts with Carson. But Carson attempts to twist it out of this usually forbidden realm by arguing that the fact of their prior prostitution was relevant to his state of mind, that is, whether he acted "knowingly, or in reckless disregard of the fact, that means of force, threats of force, … coercion …, or any combination of such means will be used to cause the person to engage in a commercial sex act" as forbidden by the statute under which he was charged, 18 U.S.C. § 1591(a). That twist would bring him under one of the exceptions to Federal Rule of Evidence 412(C) which allows evidence of prior sexual acts to be admitted if its exclusion would violate a constitutional right. Federal Rule of Evidence 412(b)(1)(C). In other words, Carson claims that the district court violated his Sixth Amendment rights when it barred him from presenting evidence of other sexual acts or prostitution by his victims. Such an argument—that the exclusion of the evidence violated a defendant's constitutional rights—requires de novo review by this court. *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016).

Defendant's argument—that he was unable to argue effectively that he lacked the requisite state of mind to violate Section 1591—was not one that he made in the district court. In the district court, his motion stated: "This evidence is admissible because it will allow the jury to determine if each of the women was actually deceived." R. 74 at 3. Because it is a new argument, we review it for plain error. Fed. R. Crim. P. 52(b). *United States v. Kruger*, 839 F.3d 572, 577 (7th Cir. 2016). But regardless of how we review the defendant's argument, the prohibited evidence was not relevant to Carson's *mens rea* and so he suffered no harm, constitutional or otherwise, when it was excluded.

Although "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense … [it] does not require the admission of irrelevant evidence (or other types of evidence whose relevance is outweighed by other important considerations)." *United States v. Beavers*, 756 F.3d 1044, 1052 (7th Cir. 2014) (internal citations omitted). In this case, whether the victims had previously worked as prostitutes was irrelevant to the required *mens rea* for the crime.

Recall that § 1591 requires that Carson knowingly or recklessly disregarded the fact that force, threats of force, and coercion, and any combination of such means, would be used to cause any of his victims—Fratto, Del Valle, Sikora and Lazzar—to engage in a commercial sex act. See 18 U.S.C. §1591(a). Whether they had previously worked as prostitutes was irrelevant to the required *mens rea* above. First, as the government points out, Carson proffered no evidence to the district court that his victims had voluntarily engaged in commercial sex transactions on other occasions. Unless he

knew that the victims had voluntarily done so in the past, he could not have reason to believe they would do so in the future. In other words, voluntary prostitution is a completely separate act from commercial sex transactions that occur as the result of force or coercion in the context of sex trafficking, and Carson offered no evidence that the women he victimized had engaged in the voluntary act as opposed to having been victims before, or more importantly, that he knew that the prior acts were voluntary. If anything, Carson must have known that whatever traits made these women easy targets for his coercion, would have made them easy targets for others as well.

Second, even if Carson could demonstrate that his victims had willingly and voluntarily worked as prostitutes in the past, based on the overwhelming evidence at trial, Carson could not plausibly argue that his victims willingly worked for him or that he thought his victims were willingly working for him. The government presented example after example of compelling evidence of coercion —evidence that Carson beat and raped the victims, that he threatened to stalk and kill them and their families, the manner in which he isolated them from the outside world, confiscating their telephones, money, identification, clothes, shoes, and manipulating them with false promises and controlling their access to the drugs for which they were physically and mentally dependent. Whether they had worked as prostitutes previously would have no effect on whether Carson knew (or recklessly disregarded the fact) that force, threats of force or coercion would have caused his victims to engage in commercial sex acts under his "employ." This is particularly true because Carson was the one using force, threatening, and coercing them. Had Carson truly subjectively believed

(whether correctly or not) that the victims were voluntarily working for him as prostitutes, he would have had no reason to rape, beat and threaten them, to take their telephones, clothing, shoes and control their access to drugs.

Force and coercion can be complicated topics. Sometimes, for example, a minor can be forced into sex trafficking by fraud alone. See, e.g., *United States v. McMillian*, 777 F.3d 444, 447 (7th Cir.), *cert. denied*, 135 S. Ct. 2392, 192 L. Ed. 2d 176 (2015). Women in desperate circumstances find themselves in situations where they are without homes, in need of drugs or food or protection and must make difficult decisions. The victims in this case certainly were in this category. Each one was inextricably hooked on illegal drugs and without resources or anywhere to go. Sometimes women in such dire circumstances voluntarily exchange sex to obtain the things they desperately need. But there is nothing voluntary when they are forced to do so by another person. And there is nothing blurry or in the grey area when the coercion involves, rape, brutal physical violence, abrupt withholding of drugs to cause severe withdrawal symptoms, death threats, taking women's phones and clothing and following them with GPS technology. No rational person could witness such force and coercion, let alone inflict it himself, without knowing or recklessly disregarding the fact that the threats and force of threats and coercion, or any combination of them, caused these women to engage in commercial sex acts.

Our decision today follows directly from the conclusion in *Cephus*, which involved a sex trafficker who brutally beat women who failed to comply with his orders. There the defendant wished to cross-examine one of the victims about her prior work as a prostitute to demonstrate that she would

not have been deceived by the defendant and thus was not coerced into working for him. *Cephus*, 684 F.3d. at 708. We concluded that any such evidence would have been irrelevant, explaining that,

> [The defendant] wanted to suggest that having already been a prostitute she would not have been deceived by [the defendant] and therefore her testimony that she was coerced into working for him … should be disbelieved. But the testimony sought to be elicited by the cross-examination would have been irrelevant. Even if no promises were made to [the victim], this would not be evidence that she consented to be beaten and to receive no share of the fees paid by the johns she serviced. And even if she knew going in, from her prior experience, that [the defendant] probably would beat her, it was still a crime for him to do so. And finally the fact that she'd been a prostitute before does not suggest that he didn't beat and threaten her—that was his *modus operandi* and there's no evidence that he would have made an exception for Cassandra.

*Id*.

For the same reasons, a number of other circuit courts have similarly held that acts of prior prostitution are irrelevant to a charge under § 1591(a) and thus barred. Most recently, the First Circuit, in a case where the defendant was making the same *mens rea* argument in a sex trafficking case, noted that similar evidence of prior prostitution was "either entirely irrelevant or of such slight probative value in com-

parison to its prejudicial effect that a decision to exclude it would not violate [the defendant's] constitutional rights." *United States v. Gemma*, 818 F.3d 23, 34 (1st Cir.), *cert. denied*, 137 S. Ct. 410 (2016). The court went on to note that the victim's participation in prostitution before or after doing so with the defendant had no relevance as to whether this particular defendant used force and the threat of force to cause her to engage in commercial sex. *Id.* (citing *United States v. Roy*, 781 F.3d 416, 420 (8th Cir.2015) (same); *United States v. Lockhart*, 844 F.3d 501, 510 (5th Cir. 2016) (evidence of the victim's pre- and post-indictment acts of prostitution would be irrelevant as to whether the defendants caused the victim to engage in a commercial sex act in instant case); *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2396 (2016) ("That some of the victims may have been prostitutes before working at the bars does not suggest that Appellants did not later threaten them with violence or deportation in order to coerce them into commercial sex. Thus there was no relevant use of cross-examination testimony sought by Appellants and the district court did not err by precluding it."); *United States v. Valenzuela*, 495 Fed. Appx. 817, 819–20 (9th Cir. 2012) ("whether appellants believed the victims were working in prostitution prior to coming to the United States and thus would willingly continue is irrelevant because there is ample evidence that the victims did not continue to work willingly once in the United States while the defendants harbored and maintained them with the knowledge that force, fraud, or coercion would be used to cause the victims to engage in commercial sex."); *United States v. Elbert*, 561 F.3d 771, 777 (8th Cir. 2009) (whether minor victims "had engaged in acts of prostitution before or after their encounters with [the defendant] is irrelevant, and

would only prove other people may be guilty of similar of-
fenses of recruiting, enticing, or causing these victims to en-
gage in a commercial sex act.")

In sum, evidence about the victims' prior commercial sex
acts was irrelevant to the question of whether Carson knew
or recklessly disregarded the fact that his own use of force,
threats, and coercion caused the victims to engage in com-
mercial sex acts during their time with him. The district
court did not err in barring evidence of prior commercial sex
acts by the victims in this case.

## B.    Limitations in the cross-examination of the govern-
## ment witness.

To convince the jury that Carson knew that Fratto was
only seventeen years old, the government called Christopher
Richardson who testified that he personally told Carson on
at least two separate occasions about Fratto's age.[1] Richard-
son was far from an ideal government witness. He was testi-
fying under a grant of immunity, had participated in many
aspects of the crime at hand, was a convicted felon and a ha-
bitual drug user. The jury found out about all of this. At trial
Richardson testified that the government had offered him a
grant of immunity to testify and that he understood that
nothing he would say in his testimony could be used against
him in the future. Richardson then testified about the role he

---

[1] The government's expert witness on sex trafficking testified that people
involved in the sex trafficking trade commonly tell other traffickers the
age of minors because if the receiving trafficker is prosecuted for his un-
witting use of a minor and that information was known but undisclosed
by the selling trafficker, then the receiving trafficker will retaliate against
the selling trafficker because of the increased penalties for trafficking a
minor. Tr. 12/3/13 at 288 (R. 162 at pageID 1618).

played in trafficking Fratto. Richardson brokered the introduction between Carson and Fratto, he watched as Carson took provocative (and sometimes nude) pictures of the underage Fratto to use in advertising her services and he drove Fratto to some of her appointments where she exchanged sex for money. During his direct examination, the jury also learned that Richardson used marijuana almost daily from the time he was 15 until the time he was 28, he started selling cocaine when he was 19 years old, and in 2010 he was convicted of a felony narcotics offense for which he received a five-year sentence. The defense honed in on all of this to its advantage arguing in closing that Richardson was a convicted drug dealer, testifying under a grant of immunity and that his testimony deserved "little to no[]" weight. Tr. 12/10/13 at 1322 (R. 166, pageID 2653).

But Carson wished to sully Richardson's testimony more. Over the government's objection, Carson's counsel tried to question Richardson about a trip he took with Fratto to Springfield, Illinois after Fratto began working for Carson. Carson's counsel informed the district court that he had evidence that during the trip Richardson "offered to pimp" Fratto. The district court ruled the line of questioning irrelevant and forbade it, reasoning that were he to allow it "we would end up trying a different case." Tr. 12/3/13 at 228 (R. 162, pageID 1526).

A district court has broad discretion to impose reasonable limits on the extent and scope of cross-examination. *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009). But of course those limits are constrained by a defendant's Sixth Amendment right to confront the witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). Although

"the Sixth Amendment guarantees defendant an opportunity for effective cross-examination … there is no guarantee of cross-examination to whatever extent the defense might wish." *Recendiz*, 557 F.3d at 530. Where a trial court's limitation on cross-examination directly implicates the "core values of the Confrontation Clause," we review the limitation *de novo;* otherwise, we review for abuse of discretion. *Id.*

One core value is the ability to expose a witness's motivation, biases or incentives for lying. *Id. (*citing *Van Arsdall*, 475 U.S. 678–79); See also *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006). "However, once a trial court permits a defendant to expose a witness's motivation, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *Recendiz*, 557 F.3d at 530 (citing *United States v. Nelson,* 39 F.3d 705, 708 (7th Cir. 1994)); see also *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.").

It would offend the Sixth Amendment to deny a defendant the ability to establish that the witness had a motive to lie, but once that motivation has been established, the defendant has no constitutional right to pile on. See *Recendiz*, 557 F.3d at 530. And after the motive has been established, a judge has a wide latitude to impose reasonable limits on cross-examination. *Van Arsdall*, 475 U.S. at 679. The district court judge can decide that the defendant has had ample opportunity to demonstrate motivation and that additional cross-examination is either not relevant, too prejudicial, would confuse the jury, is repetitive, or any of the other

many reasons a district court might limit the scope of cross examination. See *Id.*; *Nelson*, 39 F.3d at 708. Even if the judge prohibits the cross-examination in error, that error is harmless depending upon factors such as the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence, and the overall strength of the prosecution's case. *Smith*, 454 F.3d at 715.

Because the district court did not prevent Carson from establishing Richardson's motivation for testifying or lying during his testimony, the court's limitation on the evidence about the trip to Springfield did not implicate Carson's Sixth Amendment right to confrontation. See, e.g. *Recendiz*, 557 F.3d at 530. Thus we review the district court's decision to limit the cross-examination for an abuse of discretion. But even were we reviewing de novo, this is a case in which the witness's motivations were amply exposed. Richardson testified off the bat that he was testifying in exchange for a grant of immunity. The jury learned that he had a tremendous amount to gain by testifying. There was no question that he was covered in the detritus of Carson's sex trafficking of a minor. After all, he brokered the introduction, drove Fratto to two different hotel rooms, paid for the hotel room in which Carson raped Fratto and then took pictures of the Fratto and others posed provocatively both in lingerie and in the nude. Tr. 12/2/13 at 163–179 (R. 161 at pageID 1493–1509). Richardson even accepted pay to drive some of the women, including Fratto, to various commercial sex transactions. In other words, Richardson was up to his elbows in Carson's illicit sex trafficking scheme and likely on the hook for child pornography as well (although neither Carson nor Richardson were ever indicted on child pornography charg-

es). Carson does not offer the court any reason why he thinks that the addition of the possible Springfield pimping episode would have made Richardson look any worse in the eyes of the jury than he already did because of his participation in the sex trafficking scheme in Chicago. Nor does Carson explain why Richardson would be more likely to lie to get off the hook for the Springfield pimping than he was for the Chicago pimping (and possibly child pornography). In other words, the evidence Carson hoped to elicit from Richardson was merely cumulative. And given the fact that Richardson's intentions for the Springfield trip were unknown and contested, the district court was well within its right to prevent the confusion of a trial within a trial that might occur should the evidence be permitted. "The right to confrontation is not implicated where 'limitations on cross-examination did not deny the defendants the opportunity to *establish* that the witnesses may have had a motive to lie; rather, the limitations denied them the opportunity to *add extra detail* to that motive.'" *Recendiz*, 557 F.3d at 530 (citing *Nelson*, 39 F.3d at 708). Moreover, the district court was also well within its right to limit cross-examination where the information could have confused the jury, causing it to end up "trying a different case." Tr. 12/3/13 at 228 (R. 162, pageID 1558). A district court's broad discretion to limit evidence includes evidence that might confuse a jury. *United States v. Trent*, No. 16-3960, 2017 WL 2979658, at *4 (7th Cir. July 13, 2017). The district court did not abuse its discretion by excluding the Springfield testimony.

## C.    Evidence of the defendant's prior bad acts.

The federal rules of evidence prohibit an opponent from admitting evidence of other acts "to prove a person's charac-

ter in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). In other words, we do not allow evidence of prior bad acts to prove or hint to the jury that a defendant is the "kind of person" who would commit an act like the one for which he is charged—that he has the propensity to act in a certain criminal manner. The evidence of other acts, however, may be used to demonstrate "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of intent." Fed. R. Evid. 404(b).

Carson argues that several pieces of evidence and testimony constituted propensity evidence—evidence used for the impermissible purpose of proving his character and that he acted in accordance therewith. The difficulty is, of course, that evidence of other acts can serve several purposes at once, leaving courts to decide when such multi-purposed evidence can be used. Our court has resolved the question by allowing it only when "its admission is supported by some propensity-free chain of reasoning." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc). "This is not to say that other-act evidence must be excluded whenever a propensity inference can be drawn; rather, Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference." *Id.* In short, we must determine how the evidence of other acts is relevant without relying on a propensity inference. *Id.* And when doing so, we give great deference to the district court's assessment of whether to admit evidence in light of Rule 404(b), and reverse only for an abuse of discretion. *United States v. Ferrell*, 816 F.3d 433, 442 (7th Cir. 2015).

The "other acts" evidence to which Carson objected, consisted of testimony about women who were not victims of the crimes charged in this case, but whose names and details were mentioned as the government presented details of the victims' experiences with Carson. Evidence about these women appeared at the trial in various forms. For example, Margaret Hurley testified that she drove other women to their appointments and appeared in Carson's advertisements. Katie Smego's name was mentioned in testimony because she posed with Fratto in provocative photographs that Carson posted in the advertising section of Backpage.com. Another woman, Amanda, was in the room with her newborn son as Carson raped Del Valle. Other women 's names were mentioned because they too were present when various parts of the charged crimes occurred, because they introduced the victims in this case to Carson, or Carson posted similar and sometimes identical advertisements for their services in Backpage.com.

The government countered that the evidence it sought to admit served as direct evidence of the charged conduct and thus outside the realm of Federal Rule of Evidence 404(b) or, in the alternative, as evidence of Carson's *modus operandi* and thus was admissible under 404(b).

Carson appears to be arguing that evidence of a defendant's *modus operandi* can be introduced *only* where a defendant's identity is in question. Brief of Appellant, Carson at 43–44. Evidence of *modus operandi* is evidence that shows a defendant's distinctive method of operation. *United States v. Robinson*, 161 F.3d 463, 467 (7th Cir. 1998). Although it is true that we permit *modus operandi* evidence to demonstrate the identity of the defendant and it is generally used as such, we

have never held that it can be used exclusively for these purposes. See *Id.*; see also, *Gomez*, 763 F.3d at 861 ("one accepted way to use other-act evidence to prove identity is to argue that the perpetrator had a distinctive *modus operandi.*"); *Nelson v. City of Chicago*, 810 F.3d 1061, 1071 (7th Cir. 2016) (litigiousness can, on rare occasions be used to demonstrate the defendant's *modus operandi* of creating fraudulent documents in anticipation of litigation); *United States v. McGuire*, 627 F.3d 622, 626–27 (7th Cir. 2010) (holding that testimony of the defendant's *modus operandi* was permissible to demonstrate how the defendant used fear and shame to keep his child victims from reporting the molestation, thus countering defendant's argument that his victim's long delay in reporting the conduct demonstrated that the victim was lying); but see *United States v. Fraser*, 448 F.3d 833, 840 (6th Cir. 2006) ("Proof of '*modus operandi*' is generally used to demonstrate identity"); *Chavez v. City of Albuquerque,* 402 F.3d 1039, 1046 (10th Cir. 2005) ("proof of a 'modus operandi' is only relevant when there is an issue regarding the defendant's identity."). We need not decide the question today.

Like all other evidence of prior bad acts, *modus operandi* can only be used if it is "relevant to a specific purpose other than the person's character or propensity to behave in a certain way," and that relevance must be "established through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case." *Gomez*, 763 F.3d at 860. Similarly, "Rule 404(b) does not require the party offering the evidence to force the evidence into a particular listed category, but simply to show *any* relevant purpose other than proving conduct by means of a general propensity inference." *Robinson*, 161 F.3d

at 466–67. Thus, if the evidence the government offered is *modus operandi* evidence or evidence in some other form, provided it was not used to demonstrate the defendant's propensity for acting in accordance with the prior bad acts, the district court did not err by admitting it.

Some of the evidence to which Carson objects is not evidence of prior bad acts at all, but rather direct evidence of the crime. And as such Rule 404(b) is not applicable at all. *Ferrell*, 816 F.3d at 443. See also *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010) ("if the evidence is admitted as direct evidence of the charged offense, Rule 404(b) is not applicable"). For example, the description of the other woman, Katie Smego, in the hotel room when Fratto met Carson is not evidence of another bad act, but merely a description of the scene into which Fratto arrived. It would be odd for Fratto to testify about her first encounter with Carson and not be able to describe who else was in the room when the crime had its genesis. And it is directly relevant to the charged crime because, as Dr. Cooper testified, sex traffickers often use other women of the same approximate age and background as grooming tools to help coerce a victim into joining the trafficking enterprise. This is not, therefore, another bad act, but rather part and parcel of the crime at issue. Likewise, Fratto's description of taking provocative pictures with Smego is direct evidence of the crime for which Carson was charged—sex trafficking an underage Fratto.

Similarly, the testimony from the driver, Margaret Hurley, established that she was present when the women (and in at least one case, a girl) were paid and then handed their money over to Carson, and that she was present when some of the women were beaten. Her testimony was direct evi-

dence of the crime. That it may have tangentially mentioned driving other women who were not named victims in the course of driving the named victims is of no moment, and certainly if it was prejudicial, it was well within the realm of discretion for the district court judge to admit it after balancing the probative value against the risk of prejudice. See *Thompson v. City of Chicago*, 472 F.3d 444, 453 (7th Cir. 2006). The fact of the matter is that Carson ran a sex-trafficking business with many women in his grasp. It would be near to impossible to describe any of the operations involving the named victims without mentioning the other women who were in the same hotel rooms at the same time, whose advertisements ran alongside those of the named victims, who were being driven to and from the commercial sex transactions by the same driver at the same time, and who either watched the physical, emotional and sexual abuse of the victims or were watched by them while being abused.

In addition to being direct evidence of the crime, much of the evidence to which Carson objected helped to corroborate the details of the victims' testimony—testimony that the defense claimed was not credible. See *United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010) (other acts evidence can be used to corroborate testimony). For example, Fratto's testimony that she was forced to work with other prostitutes named China and Vanessa was corroborated by evidence of Carson's advertisements for women named "China" and "Vanessa."

Carson singles out one particular example of other bad act testimony to which he particularly objects—that is, that Sikora testified that Carson raped her in the presence of another woman, Amanda and her newborn child, who sat in

the room as she screamed out and cried. The rape was direct evidence of Carson coercing one of his victims and exerting control over her. The presence of another in such a rape is not extraneous or evidence of other bad acts, it is a key part of the message from the defendant that "I control you and can do as I please and I have so much power that no one else will come to your aid, even if they are sitting right in the room." It also explained to the jury the existence of photographs of the act. This was evidence of the very crime, pure and simple. In the same vein, the evidence about Katie Smego also helped create the climate of fear. Fratto testified that when she tried to leave the defendant told her that he would kill her like he had already killed Smego. These types of details are directly relevant to the crime at issue which specifically entails force and threats of force.

This testimony was also particularly relevant because Carson argued that these victims "acted as his girlfriend, coming back for more work after leaving voluntarily, and asking him to control their cash and limit their drug consumption," or providing them with a place to stay. Brief of Appellant, Carson at 49. This evidence, however, is evidence of coercion—coercion through intimidation and rape, and by sending a message that his control was so severe that other women present would not come to the aid of the victims. And the fact that Carson kept women around in hotel rooms, or hired drivers to control their movements on the way to and from the transactions, was further evidence of the power of his large enterprise and sent the message out that he was the CEO and the one in control.

Although some of this evidence was prejudicial, in the sense that it mentions more women victims than were repre-

sented in the crimes for which Carson was charged, we certainly cannot say that the district court erred in finding that it was not unfairly prejudicial as that term is used in Federal Rule of Evidence 403 ("the court may exclude evidence if its probative value is substantially outweighed by a danger of … unfair prejudice."). Given the nature of the evidence of threats, rapes, beatings with hands, belts, extension cords, etc., the brief references to other women were not unfairly prejudicial to Carson. It is hard to imagine that the government's case would have been significantly less persuasive had the allegedly improper evidence been excluded. See *Gomez*, 763 F.3d at 863.

## D.    Jury instructions.

Carson claims that the district court's erroneous instruction on "reckless disregard" drastically lowered the *mens rea* needed to convict and thus his conviction should be reversed. That instruction was as follows:

> A person "recklessly disregards" a fact within the meaning of this offense when he is aware of, but consciously or carelessly ignores facts and circumstances that would reveal the fact that either: (1) force, threats of force, or coercion would be used to cause the person identified in the indictment to engage in a commercial sex act, or (2) the person identified in the indictment was under eighteen years of age and would be caused to engage in a commercial sex act.

R. 88 at 30. We review de novo "whether jury instructions accurately summarize the law, but give[s] the district court

substantial discretion to formulate the instructions provided that the instructions represent a complete and correct statement of the law." *United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014).

Carson argues, and the government concedes, that the instruction should have stated that Carson must "consciously **and** carelessly ignore" facts and circumstances that would reveal that coercion had occurred. Carson argues that the jury could have found that he carelessly and not consciously ignored certain facts and circumstances thus lowering the *mens rea* to mere negligence and not recklessness as required. The government concedes that the instruction was incorrect but argues that Carson forfeited the argument by failing to raise it below and that in any case the error did not affect Carson's substantial rights.

Before the district court Carson argued "[w]hen you give the reckless disregard instruction, that lowers the burden of proof, and we believe that it eliminates *mens rea*, so we are objecting." Tr. 12/9/13 at 1215 (R. 165. pageID 2546). The objection was indeed bare bones. "In order to preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection." *United States v. Thomas*, 845 F.3d 824, 831 (7th Cir. 2017). The objection cannot be merely a generalized objection, but must state with particularity the problem in the instruction. *United States v. Stott*, 245 F.3d 890, 907 (7th Cir. 2001), *amended on reh'g in part,* 15 F. App'x 355 (7th Cir. 2001), citing *United States v. Roth*, 860 F.2d 1382, 1390 (7th Cir. 1988) ("An objection that does not point out the problem in the instruction is insufficient because it does not give fair prospect of timely correction.") On the other

hand, a party is "not required to adhere to any formalities of language and style to preserve his objection on the record," but rather it is sufficient to state the objection and the grounds for it distinctly. *United States v. O'Neill*, 116 F.3d 245, 247 (7th Cir. 1997) (internal citations omitted). This is a close case in terms of the level of specificity required of the objection, but we need not decide whether to review as a plain error or harmless error, because under either standard the defendant was not harmed. *United States v. Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017) ("If the instruction contains an error or misguides the jury, we reverse a jury verdict only if the error prejudiced the litigant."). "Even a jury-instruction error of constitutional dimension is subject to the familiar requirement that the error have [sic] harmed the defendant. In other words, to constitute reversible error, the plain error must have affected the defendant's substantial rights such that there is a reasonable probability that but for the error the outcome of the trial would have been different." *United States v. Cardena*, 842 F.3d 959, 998 (7th Cir. 2016).

The risk that the jurors might have found that Carson merely ignored the facts and circumstances carelessly rather than recklessly was mitigated by the fact that the jury instructions also contained the following instruction on the term "knowingly:'

> A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct and does not act through ignorance, mistake or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence including what the defendant did or said.

(R. 88 at 29); Tr. 12/10/13 at 1375 (R. 166, pageID 2706). Thus, even if the jurors found that the defendant carelessly ignored relevant facts and circumstances, it still had to find that Carson knew those facts and circumstances in the first place, thus mitigating any concern that the jurors may have held Carson accountable for negligent rather than reckless behavior.

Moreover, given the overwhelming nature of the evidence of Carson's state of mind any error would have been harmless. A careless disregard of knowledge scenario might apply to a participant in a sex trafficking scheme who played a minor role—for example, one who acted as a driver but who stuck his head in the sand about what happened to the women after he dropped them off at a designated address, but it is hard to imagine how Carson could carelessly disregard the circumstances of the force or coercion when he was the actor forcing and coercing by manner of rape, beatings, threats, isolation, and by taking the victims' cell phones and clothing away. Similarly, there was also overwhelming evidence that Carson knew that Fratto was a minor. Both Fratto and Richardson testified that they told Carson several times, and that Fratto showed Carson her identification card. An inaccurate jury instruction constitutes harmless error where the evidence is one-sided or overwhelming. *United States v. Dobek*, 789 F.3d 698, 701 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 272 (2015). There is no reasonable probability that "but for the error the outcome of the trial would have been different." *Cardena*, 842 F.3d at 998.

Carson also objects to the fact that the instruction required only that Carson was "aware of … facts and circumstances that would reveal" a fact that he must have reckless-

ly disregarded under the statute. Carson argues that criminal recklessness requires more than awareness of "facts from which the inference could be drawn," but rather requires that the defendant actually drew the inference. Brief of Appellant, Carson, at 51. The plain language of Section 1591 criminalizes sex-trafficking activities done "in reckless disregard of the *fact*" that force, threats of force, fraud, or coercion will cause someone to prostitute herself or that a victim is a minor. 18 U.S.C. § 1591(a). Other courts to have considered the question have concluded that the phrase "reckless disregard" in this statute requires only an awareness of facts and circumstances that give rise to a risk of a Section 1591 violation, not an awareness of the risk itself. *United States v. Jackson*, 622 Fed. App'x 526, 528 (6th Cir. 2015) ("Indeed, the statute explicitly provides that '[i]n a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained or maintained, the Government need not prove that the defendant knew that the person had not attained the age of 18 years.' 18 U.S.C. § 1591(c). Reckless disregard of the victims' age is sufficient to obtain a conviction.") *United States v. Phea*, 755 F.3d 255, 261 (5th Cir. 2014) ("the Government did not have to prove that [the defendant] 'knew' [the victim] had not attained the age of eighteen if there is proof beyond a reasonable doubt that [the defendant] had a reasonable opportunity to observe [the victim].")

The government focused much of its closing argument on Carson's actual knowledge, and there was plenty of evidence from which to draw. In other words, the government set forth a theory that Carson had actual knowledge of threats, force and coercion and of Fratto's age. The evidence

in this case was overwhelming that Carson knowingly re-cruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and or solicited his vic-tims knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion or some combina-tion of those means was used to cause his victims to engage in a commercial sex act, and that in the case of one victim, that she engaged in a commercial sex transaction and had not attained the age of 18 in violation of 18 § U.S.C. § 1591. We AFFIRM the defendant's conviction and sentence.