**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILED**
**JANUARY 20, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37635-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| LARS RONSON BRAUN, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. —

[S]ex *traffickers select victims who demonstrate vulnerabilities including homelessness, substance abuse, mental health issues, and histories of physical, emotional or sexual abuse. A typical trafficker recruits victims by telling them that he loves them, promising them a better life, providing them with shelter and drugs, and lying to them about the nature of the job. . . .*

*. . . .*

[T]*raffickers control their victims through physical violence, sexual violence, psychological violence and grooming. Traffickers . . . groom victims with promises and compliments, but escalate to physical abuse, sexual assault and death threats. . . . They also use psychological violence such as tearing a victim down, telling them they are worthless, socially*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*

> *isolating them, and controlling them financially and by taking advantage of a victim's drug dependency. . . .*
>
> *. . . [V]ictims often stay with their traffickers—or leave and then return—because they believe they have nowhere to go; that there is no one else out there for them, and no other options for them; they feel ashamed and guilty and stigmatized, thinking that they will not be accepted elsewhere. They are also afraid that if they leave, the trafficker will find them and harm them even more egregiously.* Testimony of Sharon Cooper in *United States v. Carson*, 870 F.3d 584, 590-91 (7th Cir. 2017).

Appellant Lars Braun appeals his convictions, after a bench trial, for human trafficking and promoting prostitution. Because overwhelming evidence supports a finding that his victim engaged in prostitution as the result of Braun's manipulation, we affirm both convictions. We also reject Braun's contention that the trial court violated the appearance of fairness doctrine. We grant Braun's request for resentencing because his offender score included an earlier conviction for possessing a controlled substance.

## FACTS

This prosecution arises from the protracted, poignant, and pungent relationship between Jane, a pseudonym, and defendant Lars Braun. The four-year relationship included the performance of commercial sex acts by Jane at the request of and for the financial gain and sexual enchantment of Braun. Braun's appeal raises two principal questions. First, whether Braun, within the meaning of Washington's human trafficking statute, meted "force, coercion, and fraud" against Jane in fulfillment of one of the crime's elements? Second, whether the force, coercion, or fraud led to Jane's prostitution in satisfaction of a second element of the crime? Answers to these questions require a

2

No. 37635-4-III
*State v. Braun*

review of the language, intent, and history behind RCW 9A.40.100, Washington's trafficking statute. Answering the questions also necessitates a narrative of Jane's remarkable story, remarkable not because of its singularity or the tragedy portrayed, but because of the prevalence, yet hidden nature, of trafficking and because of the story's example of how enduring manipulation can implausibly result in the control of another's choices, even to the extent of causing the other to perform repulsive and dangerous acts. We glean the appeal's facts primarily from the trial testimony of Jane.

In February 2013, Jane began communicating with Lars Braun over the Internet. Jane was then twenty years old and married. Braun was in his early fifties and also married. Jane lived in Spokane, and Braun resided in Ellensburg. Jane knew Braun's children through her husband, who socialized with the offspring. In her cyber messages to Braun, Jane expressed concern about the methamphetamine intake of Braun's children.

At the same time that Jane started writing Lars Braun, she commenced abusing alcohol. Her alcohol use created conflict in her marriage.

By April 2013, Lars Braun and Jane spoke by phone or communicated by e-mail several hours each day. Jane then admired Braun, thirty years her senior, as an accomplished intellectual. Jane divulged her marital problems. Braun advised Jane to engage in an extramarital affair. Braun expounded that he rekindled his marriage by cheating on his wife.

3

No. 37635-4-III
*State v. Braun*

In May 2013, Lars Braun and Jane met in person for the first time and interlocked in sexual intercourse inside a Spokane hotel room. By May, Braun and his wife were in the process of divorce. Jane's husband soon learned of her carnal encounter with Braun. Jane moved from her husband's residence and divorced him.

Lars Braun learned that Jane informed Jane's husband of her sexual encounter with Braun. Braun grew furious at Jane because he worried that his wife would also hear about the affair and use the tryst against him in their divorce and child custody proceeding. Braun ceased speaking with Jane.

Alas, the lack of interaction between Lars Braun and Jane did not last. While Jane engaged in intimate relations with another man, Braun called Jane. We do not know why Jane answered the phone during this rendezvous. During the telephone conversation, Braun screamed at Jane. Braun called Jane "'slut.'" Clerk's Papers (CP) at 253-54. Braun's clamorous comments suggested to Jane that Braun was jealous. The remarks also surprised Jane since Braun had told her he would never speak to her again. Braun and Jane spoke by phone on additional occasions in the coming days. Jane repeatedly apologized to Braun. Braun revealed to Jane she was his girlfriend.

In early June 2013, Lars Braun invited Jane to visit him in Ellensburg, where he would introduce her to his friends. Jane lacked a driver's license. So Jane traveled by bus from Spokane to Ellensburg to visit Braun. Braun there purchased alcohol for Jane, since she remained below the legal age to purchase liquor. Contrary to his telephonic

4

No. 37635-4-III
*State v. Braun*

enticement, Braun hid his relationship with Jane from acquaintances in Ellensburg.  He directed her to use the name "Kathy," and he informed others that "Kathy" and he shared a platonic relationship.  During the first visit, Braun permitted his seven-year-old son to enter the bed where Braun and Jane lay naked.

Dave, with an unidentified last name, also resided with Lars Braun in Ellensburg during Jane's early June 2013 visit.  On one day, Braun left Jane alone with Dave, during which time Dave groped Jane.  Dave informed Jane that Braun gave him permission to have sex with her.  Jane refused Dave's overture, after which Dave punched the bed by her head.  Jane ran into and locked herself in a bathroom, while crying hysterically.  She texted Braun and requested he return to the residence.  Braun declined.  When Braun eventually returned home, he accused Jane of promoting the advance by Dave because of her suggestible behavior.  Braun questioned Jane about why she did not strike Dave if she objected to the housemate's advance.  Braun volunteered that she encouraged Dave to engage in sex with her.  He instructed Jane not to report Dave to law enforcement.  Braun then initiated sex with Jane.  Jane never saw Dave again.

At 2:00 a.m. on the morning following Dave's sexual assault, Lars Braun deposited Jane at the Ellensburg Greyhound station.  Braun instructed Jane to leave Ellensburg.  Jane lacked money for a ticket, but, after pleading with the bus driver, received a free ride to Spokane.

5

No. 37635-4-III
*State v. Braun*

After her return to Spokane, Jane resided with her parents, but encountered difficulty living with them. Weeks later, Lars Braun offered to allow Jane to live with him in Ellensburg. Late in June 2013, Jane returned to Ellensburg to reside with Braun indefinitely. She brought her personal belongings. In the coming months, Braun supplied Jane alcohol, and Jane furnished Braun sex. Jane continued to employ the pseudonym "Kathy" among Braun's acquaintances.

In September 2013, Jane's monogamous sexual relationship with Lars Braun shifted. Braun expressed his desire for group sex for his impending birthday. Although Jane did not relish the idea of a quartet of bodies, she employed the Internet to procure an encounter with an Ephrata couple. When Braun and Jane met the couple in their Ephrata home, Braun pressured the woman to kiss and touch Jane. The woman refused because of Jane's reticence. Though the foursome engaged in sexual intercourse, the lethargic Braun quickly retired to the couch to nap, while Jane continued the assignation with the couple. Braun later told Jane that she failed him because of the unattractive, advancing age of the Ephrata woman. Braun's comment saddened Jane.

Lars Braun told Jane that the two should locate other individuals for group sex. Jane unearthed another man-woman couple in Yakima. When the four met, Braun directed Jane to please the man as he watched. During Jane's encounter with the male, the male grew aggressive. Despite Jane's plea to Braun to stay near, he retreated with the woman to another room.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*

Jane and Lars Braun resided together in Ellensburg from late June to December 2013. During these six months, Jane relied exclusively on Braun for food and housing. Braun supplied Jane mass quantities of alcohol.

In December 2013, Lars Braun moved to Florida without Jane. Braun never told Jane the reason behind his cross-continent move. Jane returned to Spokane and resided again with her parents. She missed and wanted the company of beau Braun. While in Florida, Braun lived with his friend, Susan.

Lars Braun and Jane distantly communicated. Braun began entreating Jane to post Craigslist ads for sex. Jane minded Braun. An individual responded to one advertisement and offered Jane money for sex. The offer of remuneration surprised Jane. She asked Braun why somebody would pay money for sex. In response, Braun encouraged Jane to market sexual performances for money. Braun spoke of dating a prostitute as tantalizing. Braun explained to Jane that he would grow bored of their exclusive relationship without the thrill of other sexual partners. He threatened to cheat on Jane if she refused to prostitute herself. Conversely, he promised to love and cherish till death do them part if Jane fulfilled his directions to sell her body.

Jane engaged in sexual liaisons with those that responded to her Craigslist postings while Lars Braun resided in Florida. Lars Braun reviewed the communications between Jane and the respondents to her ads. He instructed her on the amount to charge, which sum depended on the duration of the encounter and the nature of the act.

7

No. 37635-4-III
*State v. Braun*

On one occasion, Lars Braun requested that Jane send him a photograph of herself with the john. She humored Braun and sent a photograph. On reviewing the photo, an incensed Braun scolded Jane for appearing to enjoy the assignation.

In June 2014, Jane moved to Florida to reside with Lars Braun, who continued to live with Susan. Susan soon expelled Braun and Jane from her home. For two weeks, the reunified couple then slept on an air mattress in the outdoors. Braun found employment at a pizzeria. His boss allowed him and, by extension, Jane to sleep at the restaurant. In the daytime when Braun did not work, the couple resigned to Braun's vehicle. After residing in the pizza parlor, Lars Braun and Jane next dwelled in a motel.

While reunited in Florida, Lars Braun and Jane abused alcohol, which led to verbal and physical altercations. After fighting with Braun on one occasion, Jane exited Braun's vehicle and walked along the street. Police approached her. A woozy Jane yelled at the officers. The officers detained and placed Jane in jail.

On Jane's release from jail, Lars Braun drove her to their motel room. Jane retired to bed early that evening because of her employment with Panera Bread. Her job duties required her to open the bakery at 6:00 a.m. Braun shook Jane and called her vulgar names as she attempted to slumber. Braun grabbed Jane by her throat and straddled her. As Braun strangled Jane, he slowly released phlegm and spittle into her face. Jane constantly feared Braun thereafter.

8

No. 37635-4-III
*State v. Braun*

On a later occasion, while Jane and Lars Braun argued, Braun smashed Jane's Nintendo Wii against the ground. The destruction of the game console aggravated Jane because she lacked possessions and her parents had purchased the Wii for her as a gift. An altercation ensued, and law enforcement arrived to expel the couple from the motel room. Braun pestered Jane while she packed her belongings, which act prompted officers to threaten him with jail. Police ordered Braun to stay away from Jane's place of work. On an ensuing day, Braun disregarded the officers' demand, and approached Jane as she left work. Jane entered Braun's vehicle.

While in Florida, Jane twice left the company of Lars Braun. She returned each time.

We move forward to the summer of 2015. During this time while still in Florida, Lars Braun directed Jane to dress in provocative outfits. The duo would cruise bars, where Braun asked men to come home with him and have sex with Jane. Braun did not always ask men for money in exchange for the sex. Sometimes, he procured men to fornicate with Jane for his enjoyment and thrill.

Jane insists that she never wished to prostitute herself. She believed that her sexual performances with others, however, gratified Braun. During trial, when asked by the prosecution whether she believed she had a choice to participate in the sexual encounters, Jane responded: No. When asked about her claimed lack of choice, Jane testified:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*

> Because he—he would still—he would—I was gonna suffer. He would—he would ignore me or still try to have sex with women and do that and have me do things I didn't want to do. And I never ever felt like I could say no. And if I did say no, it certainly wasn't going to be respected.

RP at 219.

When sober, Jane told Lars Braun that she could not engage in sex for money. Braun then provided Jane with alcohol and drugs. He also promised to participate in the sexual acts with her. While under the influence, Jane relented to engage in sex with others. Braun rarely kept his promise to partake in the encounter, however. The money gained from Jane's tricks paid for motel stays, fuel, and alcohol.

For awhile in Florida, Lars Braun and Jane stayed in separate motel rooms because of their constant quarreling. On one evening, Braun, wanting to reconcile with Jane, invited her to join in sex. Jane agreed. While the two entangled in bed, Braun announced his intent to anally penetrate Jane. Jane told him: no. Nevertheless, Braun forcibly penetrated Jane's anus. The anal incursion hurt Jane. She could not sit for days.

One evening while the couple rested in a Florida motel, Jane informed Lars Braun that she intended to call her parents on the phone provided in their room, since her cell phone had broke. Jane intended to notify her parents about Braun's forcing her to engage in sexual relations with strangers for money. Braun reacted by yanking the phone cord from the wall. Jane threw the phone at Braun, who bled from the impact with the phone. Jane worried that Braun would hit her in retaliation. Braun told Jane that, if he was a

10

No. 37635-4-III
*State v. Braun*

woman and she a man, law enforcement would jail her for her conduct. Braun's

comment horrified a repentant Jane, who employed the motel lobby phone to report, to

law enforcement, her assaultive behavior. She also struck herself in the nose with a beer

bottle to demonstrate her remorse to Braun. Law enforcement journeyed to the motel and

arrested Jane.

Jane spent thirty-five days in a Florida jail for assaulting Lars Braun. The Florida

court issued a no-contact order between the two. Apparently Florida correction officers

do not enforce no-contact orders, because Braun twice visited Jane in jail. During his

first visit, Braun voiced his everlasting love for Jane. On the second visit, Braun reported

that he had been fired from his job and intended to return to Ellensburg. Braun asked

Jane to call him on her release from jail.

While Jane resided in the Florida jail, motel staff disposed of all of Jane's

belongings, including her Social Security card. Jane believes that Lars Braun permitted

staff to discard her possessions. After release from incarceration in July 2015, Jane

journeyed by bus to Spokane. Once in Spokane, Jane's father drove her to Ellensburg to

reunite with Braun.

In Ellensburg, Lars Braun and Jane stayed at Bill Thulean's house. Both Braun

and Jane then engaged in recreational methamphetamine use. Before leaving Florida,

Jane had used methamphetamine one time. While in Ellensburg, Jane became addicted to

the controlled substance. She relied on Braun for access to the drug. Braun's primary

11

No. 37635-4-III
*State v. Braun*

source was Thulean.  Braun commenced referring to Jane as his "'little meth whore'"

and parceled drugs to her if she performed sexually the way he desired.  Report of

Proceedings (RP) at 146.

Jane's prostitution continued in Ellensburg.  Lars Braun dictated the clothes and

makeup that Jane wore.  Braun allowed Jane to keep twenty percent of the money she

earned from her services, but he otherwise kept all money earned.  Jane's twenty percent

of the earnings went to refining her looks and to the couple's food.  Braun did not permit

Jane her own phone.

Lars Braun dictated the length and nature of Jane's profitable sexual activity.  If

the rendezvous lasted longer than planned, Braun punished Jane by arranging encounters

with violent johns.  Braun would also shun Jane for days.  If Braun concluded that Jane

immensely enjoyed herself during a sexual encounter, he punished her by insisting on sex

with him immediately thereafter.

Lars Braun sometimes arranged sexual encounters for Jane without her knowledge

and while using her e-mail account.  He misrepresented to Jane the nature of upcoming

trysts.  Braun numbered the quantity of men with which Jane engaged in sex.

Periodically he announced the number to Jane, while labeling her a slut.

Lars Braun nicknamed Jane "whore," "'little floozy,'" and "'F toy.'"  RP at 243.

Acquaintances referred to Jane as Braun's property, and men asked, in Braun's presence,

for the services of Jane.  Braun informed Jane that, despite his loving devotion to her, no

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*

one else liked her because of her loose morals. Braun constantly told Jane that the only valuable asset she had to offer to the world was her body. Braun isolated Jane from her parents by insulting them to Jane and telling Jane that her parents were ashamed of her and wanted no contact with her. Braun insisted that Jane owed him sexual favors because of her infidelities with others.

Lars Braun once drew a bucket with sperm dripping into the bucket. He labeled the bucket with Jane's name. A confused Jane interpreted the amount of detail Braun drew on the dribbling picture as displaying his love for her.

Sometimes Lars Braun promised Jane that, if she did as requested, he would marry her, have children with her, and start a family with her. Jane desperately wanted children. Once Lars Braun told Jane that, if she obeyed him one last time, he would not demand she perform sex with another again. The promise went unfulfilled.

Although many of Jane's sexual encounters resulted in monetary payment, Lars Braun arranged for some rendezvouses in exchange for other goods and services. Lars Braun allowed Bill Thulean to periodically fornicate with Jane in exchange for drugs. Jane once trysted with a man in exchange for access to a shower. On another occasion, Jane netted the duo a temporary residence with her services. At the arrangement of Braun, Jane performed sexual turns for cigarettes and chewing tobacco. Jane once had intercourse with a man in exchange for Braun engaging in sex with the man's wife.

No. 37635-4-III
*State v. Braun*

When Braun's boss caught him stealing money from work, the employer agreed to withhold calling law enforcement in exchange for sexual encounters with Jane.

Some of Jane's sexual encounters caused her pain or placed her in danger. When Jane complained to Lars Braun about pain from her sexual assignations, Braun would disburse unlawful medication to her. Jane then felt loved.

Lars Braun once left Jane alone with a man after Braun tied her to a tree. She pleaded with Braun not to leave her alone with the john. Braun left for over an hour while he ate at a Taco Bell restaurant. On another occasion, while Jane lay roped to a bed, a man sharpened his machete nearby. When performing fellatio on another man, Jane could not breathe. The man's penis penetrated her throat far enough to choke her. She vomited and needed to swallow her vomit while the male continued to orally penetrate her, despite her striving for his attention by tapping him from behind and kicking her legs.

Lars Braun and Jane referred to one john as "'Trailer Guy.'" CP at 266. When angry at Jane, Braun occasionally threatened her: "'trailer guy is coming over.'" CP at 266. On one day, Braun scheduled a tryst at a hotel with Trailer Guy because of Braun's ire, and Jane begged Braun not to leave the hotel room because of the john's past history of injuring her during their sexual encounters. Braun, nonetheless, left Jane alone in the hotel with the man he knew would hurt her physically.

14

No. 37635-4-III
*State v. Braun*

On another occasion, Lars Braun arranged for Jane to trick with two men in exchange for money to repair his truck. The second man in the pair violently held Jane's head down on the bed. Braun knocked on the door. Jane yelled that she was unable to stand. The man ejaculated and then released Jane's head. A bleeding Jane rose and opened the room door for Braun. She went to the bathroom to rest from the pain. Braun followed her, stroked Jane, and announced: "'Now it's my turn.'" CP at 267. When Jane did not respond, he angrily shouted: "You just F'd them and you're not even paying any attention to me." CP at 267. She told him that she was hurt and bleeding. She knew, however, that, despite her pain, pleasing Braun held first priority.

On one occasion, Jane bled because of a rough rendezvous. Lars Braun, despite Jane's moans from pain, insisted on sex with her that night.

At an unidentified time, Lars Braun posted an advertisement on Craigslist for sex with two women, Jane and another girlfriend of Braun's. The advertisement included the acronym BOGO, shorthand for "buy one, get one free." Jane met the other woman and concluded that the lady suffered a developmental disability. She expressed to Bill Thulean and Braun the unseemliness of employing the lady as a prostitute. The two men laughed in response. Jane and the second woman engaged in two encounters with men. Braun also directed the lady to have oral sex with him and with Thulean.

15

No. 37635-4-III
*State v. Braun*

Jane sometimes engaged in consensual bondage with Lars Braun. He liked to tie her to a bed. Braun permitted others to enter the room and see Jane naked while restrained.

During the pair's stay in Ellensburg in 2015-16, police occasionally responded to vociferous arguments between the two. Because of the presence of illegal drugs in her vicinity, Jane each time refrained from informing law enforcement about Braun's use and abuse of her. One day in Ellensburg, during a time when the couple occupied Lars Braun's truck, Braun slapped Jane in the face. The police responded. Jane asked law enforcement not to press charges, however, because all of her belongings were in Braun's truck. She feared Braun's fury if authorities arrested him.

In 2017, Lars Braun and Jane resided in Braun's deceased father's Colfax home. Braun continued to require Jane to perform sex with others, but now without pay. The sex was only for Braun's titillation. Jane still believed she had no choice but to obey.

During the time in Colfax, Jane, as the result of methamphetamine use, became emaciated and decreased to ninety pounds. She suffered from bladder infections and thinning hair. Jane experienced multiple seizures. Nonetheless, Braun continued to schedule sexual encounters for her. The couple received methamphetamine in return. Braun occasionally tied Jane to the bed and allowed his son to view her naked.

While the couple resided in Colfax, the pair traveled to the Carolinas, where Lars Braun bought a vehicle with money he inherited from his father. While returning to

16

No. 37635-4-III
*State v. Braun*

Washington State with the purchased vehicle and at an unidentified location, Jane suffered a seizure. A nurse, who fortuitously witnessed the convulsion, directed Jane to the nearest hospital. While in the hospital lobby, Jane experienced another seizure, was taken to the emergency room, and admitted to neurology for observation. After twenty-four hours, Jane departed from the hospital, and the couple resumed their journey to Colfax.

During the same transcontinental journey, while the two traveled in New Mexico, Lars Braun received news that his son had died by drug overdose. The couple spent that night in a New Mexico hotel and planned to travel directly to Pullman the next day for the son's funeral. When Jane awoke the next morning, she felt dizzy, could barely walk, and noticed a large blister on her face. Jane ambulated to the hotel lobby, asked the desk clerk to summon an ambulance, and collapsed on a sofa.

New Mexico emergency responders ferried Jane to a hospital, where medical staff performed blood work. A physician diagnosed Jane with Stevens-Johnson syndrome as a result of an adverse reaction to her phenytoin, an anti-seizure medication. Stevens-Johnson causes the epidermis, the top layer of the skin, to die and separate. The hospital airlifted Jane to an Amarillo hospital for further treatment. Lars Braun continued on his journey to Pullman for his son's funeral. Four days later, Jane's parents retrieved her from the Texas panhandle and drove her to their Spokane home. Her mother described her appearance as that of a cancer patient.

17

No. 37635-4-III
*State v. Braun*

On the day Jane returned to Spokane in April 2017, Lars Braun texted her to inform her that he had garnered methamphetamine. The two rendezvoused in a Spokane hotel room and got high on meth. While together in the room, Jane spied Braun's phone and discovered that he had been messaging a prostitute in Lewiston. Jane then recognized her triviality to Braun. With this epiphany, she ended her relationship with Braun and returned to her parents.

Lars Braun continued to text Jane. He pleaded with her to visit him and promised he would dispense drugs for her. Braun offered to return Jane's personal possessions to her if she met him alone. Jane refused. Lars Braun e-mailed Jane's mother. He wrote the mother that, if Jane reported his conduct to anyone, Braun would inform others of the number of people with whom Jane had sex. Braun continued with unreturned texting to Jane until January 2018.

PROCEDURE

The State of Washington charged Lars Braun with one count each of human trafficking in the first degree, human trafficking in the second degree, promoting prostitution in the first degree, and promoting prostitution in the second degree. The State alleged that Braun committed all four crimes in Washington State between July 1, 2015 and April 3, 2017.

Before trial, Lars Braun moved the trial court to dismiss the human trafficking charges. Braun argued that his alleged conduct did not amount to "force, fraud, or

18

No. 37635-4-III
*State v. Braun*

coercion," an element of Washington's trafficking statute, RCW 9A.40.100. The trial court denied the motion. In so ruling, the court reasoned that the word "force," as used in the statute, included nonphysical force such as psychological pressure. Because RCW 9A.40.100 does not define "force," the trial court used one of many dictionary definitions to demarcate the word.

On June 8, 2020, during a pretrial hearing, the superior court judge commented about Washington Governor Jay Inslee's order regarding COVID-19 and the judge's own mask-wearing policy:

> You're [everyone in the courtroom] certainly free to wear a mask in here. It's encouraged by everyone. Please feel free. . . . But, I'm not requiring people, adults, to comply with the governor's order [regarding masks]. It's not my order to enforce. But certainly it's a good idea.

RP at 50.

During the June 8, 2020 hearing, the State requested a continuance due to Seattle Police Detective Maurice Washington's unavailability to testify as a human trafficking expert. The State informed the court that, due to riots in Seattle over George Floyd's death, Detective Washington's superior ordered him to remain in Seattle. The trial court denied the State's continuance motion. In return, Lars Braun motioned for the exclusion of Detective Maurice Washington's testimony rather than allow him to testify remotely. The court reserved ruling on Braun's motion.

19

No. 37635-4-III
*State v. Braun*

On June 11, 2020, the case proceeded to a bench trial. At the beginning of trial, the trial judge reiterated his mask-wearing policy:

> My policy is—is slightly different than the governor's policy. He wants everybody who is indoors to be wearing a mask at all times. Even if they sit—sit—social distancing guidelines are met. I think adults are able to run their own lives, and so I'll let you folks decide how you want to do it in this courtroom.

RP at 67-68. Near the close of the State's case, the trial court granted Lars Braun's motion to exclude Detective Maurice Washington's testimony regarding human trafficking.

Before the superior court judge delivered its decision, the judge commented about COVID-19 and pandemics in general:

> The world is sure in a turmoil right now, isn't it, with Covid 19, with the unprecedented—which means "never happened before", not in my lifetime, not in the lifetime of my parents, who are both in their 80s. Theoretically it happened in 1917. We don't really know because the newspaper reporting back then was somewhat sensationalized; similar to today. But the public health response to that crises was different than this one.

RP at 295. The judge also mentioned the uncertainty in the judicial system resulting from the perceived pandemic:

> Thus, we're here. We're doing a bench trial for Mr. Braun, not a jury trial, because we can't say when we're going to have the ability to bring jurors back into the courthouse. Wow. Wow. Uncertainty.

RP at 295-96.

Before rendering his decision, the superior court judge discussed the George Floyd

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*


protests occurring in Seattle in May and June 2020:

> This very case is touched by another crisis that's going on 105 miles away from here in Seattle right this very minute. *There are blocks, city blocks, of the largest city in our State that are in anarchy. There is no law. Or perhaps there is law; it's just not the law that we're used to. Someone else is deciding what the law is, not us, as the people who are in charge of the sovereign.* So I've been thinking about these things a lot.

RP at 296 (emphasis added).

> We have blocks and blocks in Seattle this second that caused it so a witness couldn't come to this trial because he's a police officer and he can't break away to come down here. He's got—he's got to police the City of Seattle. And it's not going so well *if people don't want to follow the rules*. Psychologically. Right?

RP at 298 (emphasis added).

The trial court found Lars Braun guilty of human trafficking in the first degree and promoting prostitution in the first degree. The court acquitted Braun of the lesser included offenses of second degree human trafficking and second degree promoting prostitution.

The trial court entered findings of fact and conclusions of law. Lars Braun does not challenge any of the findings of fact. We, however, quote those findings relevant to his use of force and his forceful conducting causing Jane to engage in sexual acts. We repeat some of the facts already written, because Braun contends the findings do not support his conviction for human trafficking and we wish to meet this contention.

The trial court found, among other facts:

21

No. 37635-4-III
*State v. Braun*

> While living in Florida, they [Lars Braun and Jane] . . . had several violent encounters where the police were called.

CP at 257.

> While drunk, the defendant . . . on one occasion strangulat[ed] her [Jane]. While he was on top of her, he spit phlegm and saliva all over her face, refusing to let her sleep, every time she would fall asleep, he would wake her up, even though she had to be at work at 4 a.m. the next morning. From this point forward, she was afraid of the defendant, this event always in her mind.

CP at 258.

> On one occasion in Florida when they were fighting, he told her he was going to "F- [her] in the ass right [there]." She told him no, but he forced his penis into her anus with no lubrication. It was very painful for her.

CP at 258.

> One time in their truck in Ellensburg, he slapped her in the [face]. . .

CP at 261.

> There were particular Johns who were mean to the victim, including one they referred to as "Trailer Guy," and he [Lars Braun] would threaten her [Jane] by saying, "trailer guy is coming over," if he [Braun] were [sic] angry at her. One time he arranged a meeting at a hotel with trailer guy because he was angry at [Jane] and she begged him not to leave the hotel room because she was afraid of how Trailer Guy always physically hurt her during their sexual encounters, but the defendant left her alone in the hotel with the man he knew would hurt her physically.

CP at 266.

> The victim [Jane] became completely dependent upon the defendant. All of her belongings were in his truck. She did not drive. She felt that she had no choice but to do what he wanted, if she did not, she would suffer.

22

No. 37635-4-III
*State v. Braun*

CP at 266.

> On one occasion, the defendant arranged for [Jane] to have sex with two men in exchange for money to repair their truck. The defendant told her she had to do it because they needed the money to fix the truck. In the encounter with the second man, he was very violent to the victim and took longer than the defendant was expecting. The man was holding [Jane]'s head down on the bed and the defendant came and knocked on the door [Jane] yelled to him that she could not get up. The man ejaculated and the victim got up and let the defendant into the room. She went to the bathroom where she was bleeding from the violent encounter with the [j]ohn and in a lot of pain. The defendant started touching her saying, "Now it's my turn." When she did not respond, he got angry and yelled at her, "You just F'd them and you're not even paying any attention to me." She told him that she was hurt and bleeding. She knew that no matter how she felt, making the defendant happy was the priority.

CP at 267.

> In December 2016 or January 2017, the defendant's father died, and [Jane] and the defendant moved into his deceased father's house in Colfax, Washington. At that point, the defendant continued to advertise and offer [Jane] to people for sexual encounters, but no longer got money; he just *forced her* to have sex with strangers for his own sexual gratification. Even without them paying him, [Jane] believed that she had no choice but to continue to have sex with the strangers who the defendant arranged for and *did not believe she could say no.*

CP at 268 (emphasis added).

> The defendant would tie [Jane] to the bed in the bedroom in Colfax.

CP at 269. The court also found:

> While they were together, [Jane] believed she could not live without him based on what he had told her while they were together and the way he controlled her money, drugs, food, and every facet of her life. She believed that no one else would be willing or able to love her because he repeatedly

23

No. 37635-4-III
*State v. Braun*

to her that. . . . In their time together, her self-esteem was completely
destroyed.

CP at 270.

The trial court entered the following conclusions of law, some which could also be

read in part as findings of fact or mixed findings and conclusions:

> 3.1. On or between July 1, 2015 and April 3[, 2017], the defendant:
> 3.1.1. Recruited, transported, transferred, provided, obtained,
> bought, purchased, and/or received by any means [Jane] knowing or in
> reckless disregard of the fact that force, fraud, or coercion would be used to
> cause [Jane] to engage in a sexually explicit act or a commercial sex act; or
> 3.1.1.1. The force/fraud/coercion used to include [sic] during the
> hundreds of incidents of sexual trafficking described by [JANE].
> 3.1.1.2. The defendant lied to her about what was happening
> 3.1.1.3. The defendant bound the victim (tied her up)
> 3.1.1.4. The defendant exerted *psychological force* through
> controlling her money, her phone, her drugs, her transportation, and her
> self-esteem
> 3.1.1.5. There was evidence of *physical coercion* as well, including
> an *immediate threat to physically harm, restrain, or destroy* [Jane]'s
> property.
> 3.1.1.6. The victim was afraid of the defendant
> . . . .
> 3.2. That these acts or this venture involved sexual motivation
> 3.2.1. The evidence supporting sexual motivation include that the
> first time she had sex with someone she did not want to was for his
> Birthday in September of 2013 and from that point forward he would tell
> her consistently and repeatedly that it turned him on for her to be with a
> promiscuous woman, and
> 3.3. That any of these acts occurred in the State of Washington.
> . . . .
> 4.1. That on or between July 1, 2015—April 3, 2017, the defendant
> 4.1.1. [K]nowingly advanced prostitution by compelling [Jane] by
> threat or force to engage in prostitution or profited from prostitution
> resulting from such threat or such force, and
> 4.1.2. That any of these acts occurred in the State of Washington.

24

No. 37635-4-III
*State v. Braun*

CP at 272-74 (emphasis added).

The trial court conducted a sentencing hearing. The court calculated Lars Braun's offender score at one, based on his sole prior conviction for possession of a controlled substance. The trial court imposed a sentence of 184 months' confinement for the human trafficking charge and 34 months' confinement for the promoting of prostitution charge. The sentences run concurrently.

## LAW AND ANALYSIS

On appeal, Lars Braun challenges his two convictions and his sentence. Braun also objects to the superior court judge's comments about COVID-19 and the George Floyd protests. He asserts that those remarks establish an appearance of unfairness that infected the entire proceeding. We begin by analyzing the validity of Braun's conviction for human trafficking.

### Human Trafficking

Lars Braun contends on appeal that the trial court misconstrued the word "force" used within RCW 9A.40.100, Washington's human trafficking statute, and the misinterpretation renders the statute void for vagueness. In turn, Braun maintains that, under a correct construction of RCW 9A.40.100, the State presented insufficient evidence to show he violated the statute's element of the imposition of force, coercion, or fraud against the victim. Finally, according to Braun, the State failed to prove that any force,

25

No. 37635-4-III
*State v. Braun*

fraud, or coercion caused Jane to engage in commercial sex. Before deciphering RCW 9A.40.100 and before deciding whether sufficient evidence supports a conviction, we outline the legislative history and the purpose behind RCW 9A.40.100.

Trafficking in persons is a modern form of slavery whose victims are commonly women and children. 22 U.S.C. § 7101(b)(1); *Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1069 (D. Minn. 2017). Human trafficking is the fastest growing worldwide criminal industry. *HUMAN TRAFFICKING: A GLOBAL ENTERPRISE*, freeforlifeintl.org. 31 July 2020; Louise Shelley, *Human Trafficking: A Global Perspective*, Cambridge University Press, p. 2. ISBN 978-1-139-48977-5 (2010).

Even before the Washington Legislature created the state crime of human trafficking, the United States Congress, in 2000, as part of its authority to implement the Thirteenth Amendment's prohibition of slavery, enacted the federal Trafficking Victims Protection Act, 18 U.S.C. § 1591, the analog to Washington State's RCW 9A.40.100. The federal statute and numerous state statutes in general penalize one who recruits, harbors, transports, transfers, provides, obtains, or receives by any means another person knowing that force, fraud, or coercion will be used to cause the person to engage in forced labor, involuntary servitude, a sexually explicit act, or a commercial sex act. 101 A.L.R.6th 417, 417 (2015). The federal statute reads:

> Whoever knowingly . . . in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . .

26

No. 37635-4-III
*State v. Braun*

> knowing, or . . . in reckless disregard of the fact, that means of force,
> threats of force, fraud, . . . or any combination of such means will be used
> to cause the person to engage in a commercial sex act, . . . shall be punished
> as provided in subsection (b).

18 U.S.C. § 1591(a).

In 2003, Washington became the first state to outlaw human trafficking.

BRIAN BONLENDER, WASHINGTON DEPARTMENT OF COMMERCE, STATEWIDE

COORDINATING COMMITTEE ON SEX TRAFFICKING: REPORT ON COMMITTEE ACTIVITIES

AND PLAN TO ADDRESS SEX TRAFFICKING (RCW 43.280.091), at 4 (2014)

[https://perma.cc/LR7X-QSZH]; LAWS OF 2003, ch. 267, § 1 (codified as RCW

9A.40.100). The Washington Legislature adopted the measure in response to the murders

of Filipina mail-order brides in Washington State in the 1990s and early 2000s. Velma

Veloria, *The Road to H.B. 1175: Making Human Trafficking a Crime in the State of*

*Washington, My Story*, 9 SEATTLE J. FOR SOC. JUST. 549, 549-50 (2011).

Washington's statute, RCW 9A.40.100, declares, in relevant part:

> (1) A person is guilty of trafficking in the first degree when:
> (a) Such person:
> (i) Recruits, harbors, transports, transfers, provides, obtains, buys,
> purchases, or receives by any means another person knowing, or in reckless
> disregard of the fact, (A) that *force, fraud, or coercion* as defined in RCW
> 9A.36.070 will be used *to cause* the person to engage in:
> (I) Forced labor;
> . . . .
> (III) A sexually explicit act; or
> (IV) A commercial sex act, or . . .

27

No. 37635-4-III
*State v. Braun*

          (ii) Benefits financially or by receiving anything of value from participation in a venture that has engaged in acts set forth in (a)(i) of this subsection; and
          (b) The acts or venture set forth in (a) of this subsection:
          . . . .
          (ii) Involve a finding of sexual motivation under RCW 9.94A.835;

(Emphasis added.) The state act differs from the federal statute in that the state statute omits the phrase "threats of force" from the list of methods employed to cause the victim to engage in commercial sex.

For purposes of the prosecution of Lars Braun, the State sought to prove the crime's elements of: (1) recruiting, harboring, transporting, transferring, obtaining, purchasing, or retaining Jane, (2) while knowing or in reckless disregard of the fact (3) that force, fraud, or coercion will be used (4) to cause Jane to engage in (5) forced labor, a sexually explicit act, or a commercial sex act, (6) with a sexual or financial motivation. This appeal focuses on the second, third, and fourth elements. Braun does not challenge the sufficiency of evidence for purposes of elements one, five, and six.

### *Force*

The third element of RCW 9A.40.100 identifies three nouns, "force," "fraud," and "coercion," as the cause for commercial sex. Despite the inclusion of the terms "fraud" and "coercion" in the statute, the parties focus on the word "force" and dispute the meaning of the term in the context of the statute.

28

No. 37635-4-III
*State v. Braun*

The trial court found that Lars Braun engaged in all three activities: force, fraud, and coercion. Thus, we might limit our review to whether the evidence supported a conviction for the use of "fraud" or "coercion" and thereby avoid defining "force," while circumventing a weighing of the sufficiency of evidence for a finding of force. Following a bench trial, when a single offense can be committed by alternative methods, a conviction may rest on proof that the crime was committed by any one of the means charged. *State v. Munson*, 120 Wn. App. 103, 107, 83 P.3d 1057 (2004). We proceed to assess the sufficiency of evidence of force anyway for two reasons. First, we question whether RCW 9A.40.100 presents alternative means. Second, Braun challenges the sufficiency of evidence under each potential means and claims insufficient evidence established causation under either of the three nouns. We, however, avoid definitively circumscribing "force" because, under any of the definitions forwarded by the parties, the evidence supports the trial court's finding.

The parties may assume that RCW 9A.40.100's employment of the disjunctive "or," when listing "force," "fraud," and "coercion," suggests that the statute creates alternative means for committing the crime. We question whether "force" should be isolated and construed separately from the other methods of triggering commercial sex. Courts sometimes read the disjunctive "or" as denoting an alternative means crime. Nevertheless, the use of "or" does not always signify alternate means. *State v. Barboza-Cortes*, 194 Wn.2d 639, 643-44, 451 P.3d 707 (2019). Instead, courts ask whether each

29

No. 37635-4-III
*State v. Braun*

noun describes distinct acts that amount to the same crime. *State v. Sandholm*, 184

Wn.2d 726, 732, 364 P.3d 87 (2015). The more varied the criminal conduct, the more

likely the statute describes alternative means. *State v. Barboza-Cortes*, 194 Wn.2d 639,

644 (2019). When the statute describes minor nuances inhering in the same act, the more

likely the various alternatives are merely facets of the same criminal conduct. *State v.*

*Sandholm*, 184 Wn.2d 726, 732 (2015).

Generally the three words "force," "fraud," and "coercion" connote divergent acts,

but we notice a common theme amidst these three nouns in the milieu of human

trafficking. Trafficking comprises the concept of a human being's will being subjugated

to the will of another. *United States v. Lewis*, 644 F. Supp. 1391, 1403 (W.D. Mich.

1986), *aff'd sub nom. United States v. King*, 840 F.2d 1276 (6th Cir. 1988). In the

context of sexual trafficking, the victim believes that she lacks a viable alternative but to

perform services for the master. Force, coercion, and fraud all lead to a vanquished

independence and destroyed spirit and generally combine to effectuate sexual trafficking.

Thus, we could analyze the appeal as if force, coercion, and fraud all equate to usurping

one's willpower.

Neither RCW 9A.40.100 nor a related statute defines "force." Lars Braun argues

that the trial court committed legal error when construing the word "force" in the

trafficking statute to include nonphysical force. Even if we adopted Braun's reading of

the statute as requiring physical force, the overwhelming, if not undisputed, facts show

30

No. 37635-4-III
*State v. Braun*

that Lars Braun employed corporeal force against Jane and that he knew force would compel her to engage in commercial sex.

To repeat, Lars Braun does not challenge any of the trial court's findings of fact as unsupported by the evidence. Instead, Braun argues that the findings do not support the trial court's conclusions of law that he committed the crime. We treat unchallenged findings as verities on appeal. *State v. Allen*, 138 Wn. App. 463, 468, 157 P.3d 893 (2007).

The trial court entered many findings of fact about Lars Braun imposing physical force on Jane. Braun and Jane had violent encounters, during which someone summoned law enforcement. Braun strangulated Jane. Braun anally raped Jane. Braun slapped Jane in the face. Braun tied Jane to a tree and left her alone with a john while he ventured to Taco Bell for more than one hour. Braun tied Jane to the Colfax bed and other divans of repose.

Physical assaults by the defendant on the victim constitute force for purposes of human trafficking. *United States v. Wilkins*, 583 F. Supp. 3d 49, 73 (D.D.C. 2021). Lars Braun's assaults on Jane led to sex with Braun, not only commercial sex with johns. The defendant may be both the perpetrator of the force, fraud, or coercion and the beneficiary of the sexual act. *Ardolf v. Weber*, 332 F.R.D. 467, 475-76 (S.D.N.Y. 2019).

Lars Braun employed physical violence perpetrated by other men to compel sexual performances from Jane. When Jane perturbed Braun, Braun solicited violent men to

31

No. 37635-4-III
*State v. Braun*

engage with Jane.  Trailer Guy physically hurt Jane, and Braun issued threats of trysts

with sex with Trailer Guy.  When having intercourse for truck repairs, a man violently

struck the bed next to Jane's head.  The language of the human trafficking statutes allow

for a conviction even when the defendant did not personally use force, fraud, or coercion

as long as he knew someone would use such means.  *United States v. Todd*, 627 F.3d 329,

336 (9th Cir. 2010) (Smith, J., concurring).

The only Washington reported decision applying RCW 9A.40.100, *State v. Clark*,

170 Wn. App. 166, 283 P.3d 1116 (2012), did not need to identify the nature or

demarcate the extent of force needed for a conviction.  Since RCW 9A.40.100 echoes the

federal human trafficking statute and because *State v. Clark* provides limited guidance,

we review federal cases to assist in determining whether evidence supported a finding or

conclusion of force against Jane.  In his brief, Lars Braun often relies on federal

decisions.  The Washington anti-trafficking statute references federal trafficking statutes

in its legislative history.  See Final Bill Report, SHB 1175 (Wash. 2003), available at

http://lawfilesext.leg.wa.gov/biennium/2003-04/Pdf/Bill%20 Reports/House/1175-

S.FBR.pdf?q=20210128094842 (last visited January 2021).

The conduct of Johnelle Lewis Bell, in *United States v. Bell*, 761 F.3d 900 (8th

Cir. 2014) parallels the facts behind the prosecution of Lars Braun.  A jury convicted Bell

of, among other crimes, sex trafficking in violation of 18 U.S.C. § 1591(a).  Bell met

victim Jennifer Olewnik at a bar.  Bell informed Olewnik that he was going through a

32

No. 37635-4-III
*State v. Braun*

divorce, and the two began an intimate relationship. Bell asked Olewnik if she was interested in working as a prostitute. Bell assured Olewnik that the two would continue with a committed, intimate relationship despite her trade. He would care for her, help her regain custody of her daughter, and they would beget children together. With these assurances, Olewnik agreed to prostitute herself. Bell advertised for Olewnik's services on the Backpage website. Bell later began physically assaulting Olewnik. When Olewnik refused to prostitute at a truck stop, Bell told Olewnik she lacked a choice and struck her with a belt. Olewnik complied. Bell repeated this conduct with three other women, one to whom he wrote poetry expressing his love. When Olewnik discovered that Bell engaged in sex with one of the other women, she confronted Bell and threatened to call law enforcement. Bell slapped Olewnik in the face and choked her. On one occasion, Bell beat Olewnik for falling asleep while performing a trick. Bell insisted that Olewnik perform anal sex with johns. Olewnik performed sex, at the request of Bell, so that the money earned would purchase narcotics for both of them. At trial, Olewnik announced her continuing love for Bell and her hope he would fulfill his promises to her.

On appeal, Johnelle Lewis Bell argued that the government presented insufficient evidence to convict him of trafficking. He contended that no evidence showed that he knew that force, threats of force, fraud, or coercion would compel Olewnik and the other victims to perform commercial sex acts. He contended that the women engaged in the

33

No. 37635-4-III
*State v. Braun*

sex acts because of their love for him. According to Bell, the fact that two of the women

left his company established that he did not force them against their will to perform.

The federal circuit court, in *United States v. Bell*, concluded that the government

proved force, under the federal human trafficking statute, because Bell physically

assaulted the women when they disobeyed him. The assaults caused the women to

perform more sex acts for Bell.

In *United States v. Carson*, 870 F.3d 584 (7th Cir. 2017), McKenzie Carson

trafficked a seventeen-year-old girl in part by isolating her from her mother and not

allowing her to access a phone. Carson manipulated three other women, who were drug

users, desperate for drugs, and homeless. When entreating her to traffic her body, Carson

promised one woman, Veronica Del Valle, that she could keep all money she made.

Carson instead kept almost all of Del Valle's money. He supplied her drugs. He took her

cell phone. He beat her with belts, slapped her face, gave her black eyes, and anally

raped her. Carson warned Del Valle not to leave him or he would kill her children.

On appeal, in *United States v. Carson*, McKenzie Carson contended that the

women willingly agreed to work for him as prostitutes. They turned to him for emotional

support. The court did not deem the women's repeated turning to Carson for support

important.

> Victims of sex trafficking may make decisions that look voluntary at
> times due to the incredible weight of coercion and force upon them. And
> they may make some decisions along the way that are truly voluntary.

34

No. 37635-4-III
*State v. Braun*

> Those decisions do not take away from the fact that they have been held hostage, coerced, forced, or threatened to engage in commercial sexual acts. Sometimes that coercion and force may be subtle, leading a fact-finder to have to decipher whether the *mens rea* has been met. But this is not such a case. There is nothing subtle about rape, beatings, death threats, and taking women's clothes and phones so that they cannot readily escape. Carson kept these victims under his control by using a tightly woven web of rape, physical assault, threats, manipulation, isolation, and fear.

*United States v. Carson*, 870 F.3d at 591.

McKenzie Carson, like Lars Braun, also claimed that he did not know the women worked for him from force. The court answered:

> Had Carson truly subjectively believed (whether correctly or not) that the victims were voluntarily working for him as prostitutes, he would have had no reason to rape, beat and threaten them, to take their telephones, clothing, shoes and control their access to drugs.

*United States v. Carson*, 870 F.3d at 594.

Lars Braun's relationship with Jane included bondage. Jane in fact consented to some bondage acts, but she testified that Braun went beyond her consent. Braun argues that this encroachment on consent constituted a mere betrayal in their relationship, rather than force supporting a conviction for human trafficking. He also complains that the legislature never intended RCW 9A.40.100 to apply to domestic violence offenses and ordinary prostitution offenses.

In *United States v. Marcus*, 487 F. Supp. 2d 289 (E.D.N.Y. 2007), *vacated*, 538 F.3d 97 (2d Cir 2008), *rev'd and remanded*, 560 U.S. 258, 130 S. Ct. 2159, 176 L. Ed.2d 1012 (2010), the complaining witness began a consensual bondage, dominance, and

35

No. 37635-4-III
*State v. Braun*

sadism relationship with Glenn Marcus. Marcus later employed force and coercion to prevent her from leaving and to engage in sexual conduct that Marcus and others photographed and placed on a website. Marcus derived financial benefit from the photographs. The court rejected Marcus' contention that Congress did not intend the Trafficking Victims Protection Act to apply to conduct that occurred within an intimate, domestic relationship.

Lars Braun contends that the State may not rely on any assaults that occurred in Florida. He does not cite any authority for this argument, however. We anticipate that any court faced with this contention would rule to the contrary as long as at least one of the acts of assault occurred in the home state or if the assaults in another state led to commercial sex in the home state. We do not address the argument because some of the physical force and much of the prostitution occurred in Washington State.

### *Coercion*

We also conclude that sufficient evidence supports a conviction of Lars Braun for human trafficking based on his use of coercion within the meaning of RCW 9A.40.100. Another statute, RCW 9A.36.070, defines "coercion" as follows:

> (1) A person is guilty of coercion if by use of a threat he or she compels or induces a person to engage in conduct which the latter has a legal right to abstain from, or to abstain from conduct which he or she has a legal right to engage in.
> (2) "*Threat*" as used in this section means:
> (a) To communicate, directly or indirectly, the *intent immediately to use force* against any person who is present at the time; or

36

No. 37635-4-III
*State v. Braun*

(b) Threats as defined *in RCW 9A.04.110[28] (a), (b), or (c).*

(Emphasis added.) In turn, RCW 9A.04.110 defines the term "threat" as used in RCW

9A.40.100:

(28) "Threat" means to communicate, directly or indirectly the intent:
(a) To cause bodily injury in the future to the person threatened or to any other person; or
(b) To cause physical damage to the property of a person other than the actor; or
(c) To subject the person threatened or any other person to physical confinement or restraint[.]

Since RCW 9A.36.070(2)(b) incorporates the definition in RCW 9A.40.110, the threat,

for a human trafficking conviction, need not be of immediate force but can include

threats of bodily injury in the future.

We look to *State v. Clark*, 170 Wn. App. 166 (2012) and federal decisions to

confirm the use of coercion. In *Clark*, this court found the State proved coercion because

of the repeated beatings by DeShawn Clark of the victim, which led to the victim fearing

for her safety if she did not obey Clark's commands. The court found coercion even

though the victim left Clark's company and voluntarily returned from love. According to

one federal decision, the opportunity to escape, and even a successful escape, does not

preclude a finding of involuntary servitude. *United States v. Mussry*, 726 F.2d 1448,

1454 (9th Cir. 1984).

37

No. 37635-4-III
*State v. Braun*

When enacting the Trafficking Victims Protection Act, Congress desired the means of compelling commercial sex to not only apply to overt beatings, but more subtle means designed to cause victims to believe that serious harm will result to themselves or others if they leave the defendant. *United States v. Marcus*, 487 F. Supp. 2d 289, 301 (E.D.N.Y. 2007). Congress intended to reach cases when the trafficker holds another in a condition of servitude through nonviolent coercion. *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011); *United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004); *United States v. Marcus*, 487 F. Supp. 2d 289, 302 (E.D.N.Y. 2007). The methods of subjugating people's wills now includes subtle, more effective forms of coercion. *United States v. Mussry*, 726 F.2d 1448, 1452 (9th Cir. 1984). A pattern intended to cause a person to believe that failure to perform an act of commercial sex would result in serious harm constitutes evidence of coercion. *United States v. Campbell*, 6 F.4th 764, 775 (8th Cir. 2014) (as amended July 26, 2021). The phenomenon that force leads to coercion because of the atmosphere of ongoing beatings illustrates the proximity of the concepts of force and coercion in the context of human trafficking.

The federal appeals court, in *United States v. Bell*, 761 F.3d 900 (8th Cir. 2014), discussed above, agreed that the government proved force because Johnelle Lewis Bell physically assaulted the women when they disobeyed him. The court also found that Bell coerced them into sex acts by implied threats of more assaults.

38

No. 37635-4-III
*State v. Braun*

Lars Braun supplied alcohol and methamphetamine to Jane in order to procure and market her sexual services. When Jane became addicted to methamphetamine, Braun withheld dispensing of the drug until Jane performed. In *United States v. Mack*, 808 F.3d 1074 (6th Cir. 2015), the court affirmed a conviction of a defendant who coerced the victims into prostituting themselves by initially supplying them with drugs under the false pretense they were free. Supplying of drugs shows manipulation and control of the victim. *United States v. Betts*, 911 F.3d 523, 530 (8th Cir. 2018); *United States v. Campbell*, 49 F.3d 1079, 1084 (5th Cir. 1995).

### Fraud

RCW 9A.40.100 does not define "fraud" for purposes of human trafficking. This court, when reviewing another criminal statute, declined to define "fraud" because of the word's common understanding. *State v. Stacy*, 181 Wn. App. 553, 572, 326 P.3d 136 (2014). Federal cases examining human trafficking by fraud require "material misrepresentations" used to compel the victim. *United States v. Maynes*, 880 F.3d 110, 113 (4th Cir. 2018). A false statement is material if it has a natural tendency to influence or is capable of influencing the intended target. *United States v. Gaudin*, 515 U.S. 506, 509, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995).

The federal circuit court, in *United States v. Bell*, 761 F.3d 900 (8th Cir. 2014), previously outlined, ruled that Johnelle Bell also used fraud because he misrepresented his love for his three victims and his intent to care for each to the exclusion of the others.

39

No. 37635-4-III
*State v. Braun*

Bell preyed on vulnerable women. In *United States v. Mack*, 808 F.3d 1074 (6th Cir. 2015), the court affirmed a conviction of a defendant who led victims into prostituting themselves by initially supplying them with drugs under the false pretense the substances were free.

Lars Braun defrauded Jane by manipulation, false promises, and lies to induce her to engage in prostitution. He told Jane she was his girlfriend, but then hid their relationship from his acquaintances. Braun promised her that he would love her if she had sex with other people for money. Braun told her that, if she performed as he desired, he would marry her and beget children with her, both events that she desperately desired. Based on his representations, Jane believed Braun loved her. Braun deceptively used Jane's e-mail address to procure johns. He did not inform Jane of the parameters of sex he promised the johns. Braun deceived Jane about advertisements he posed offering her for sex exploits. He told her that no one else valued her and then isolated her. The evidence amply supported the trial court's finding and legal conclusion of fraud.

*Causation*

Next Lars Braun contends that insufficient evidence supported the trial court's conclusion that any force, fraud, or coercion caused Jane to participate in commercial sexual acts. Stated differently, according to Braun, the evidence lacked a connection between his violence, threats of violence, and misrepresentations sufficient to compel Jane to engage in prostitution.

40

No. 37635-4-III
*State v. Braun*

To repeat, Lars Braun does not challenge any findings of fact. The trial court's findings mention Jane's initial hesitancy in performing sex for money, Braun's early insistence that Jane prostitute herself or else he would cheat on her, his promise to love her if she garnered profits through sex, Jane's later constant fear of Braun because of his violence, Braun's demand that she incur income to pay for the couple's food, gas, lodging, and copious amounts of alcohol, Braun's withholding of methamphetamine and food until she completed a trick, Jane's refusal to report Braun to law enforcement because of the anger that would result, Braun's misrepresentation of a john's expected sex acts before she serviced the john, his pressuring her for sexual favors because she had been sexually active with others, and Braun's grabbing of Jane on one occasion when she hid in a back room from a man seeking favors.

Jane obeyed Braun's demands because of fear of the resultant trouble. When Jane disobeyed one of Braun's rules, Braun ignored her for days, engaged in sex with other women, and yelled at her. Jane became completely dependent on Braun for food, alcohol, and her drug of choice and Braun withheld these needs and desires from Jane. Jane could not drive. Braun possessed all of her belongings. He took all of her money. In short, like other victims of human trafficking, the force, fraud, and coercion caused Jane to rigorously obey Braun's whims, including participation in commercial sex. She had no choice.

41

No. 37635-4-III
*State v. Braun*

Lars Braun's argument of lack of causation fails to recognize the unspeakable ruin he wreaked on another human being's life. He instead challenges this court to, before affirming his guilt, dissect individual acts of sex performed by Jane and then identify one act of force, fraud, or coercion that caused that discrete act. But human trafficking does not lend itself to this atomization of cause and effect. The victim engages in all of her acts because of the triumph by the pimpish padrone over her personality, autonomy, spirituality, humanity, individuality, and free choice. This triumph results from the trafficker's masterminding a sweeping environment of force, coercion, cheating, dishonesty, degradation, and self-loathing. In this opinion, we outlined the prosecution's extensive facts to demonstrate the ability of one man, through persistent domineering and deceptive demeanor, to control another's willpower.

Given the realities of various forms of coercion to which sex traffickers subject their victims, courts recognize that traffickers often force victims to continue prostituting by creating an environment of fear and dependence through the use of threats of violence, actual violence, and various forms of manipulation against them. *States v. Wilkins*, 538 F. Supp. 3d 49, 72 (D.D.C. 2021). When evaluating if a defendant exerted coercive force over a complainant, the trier of fact should evaluate the totality of a defendant's conduct toward a trafficking victim, including any threats or specific instances of past violence that may have created a culture of fear that renders the victim's acts involuntary. *United States v. Carson*, 870 F.3d 584, 600 (7th Cir. 2017).

42

No. 37635-4-III
*State v. Braun*

Lars Braun anally raped Jane on one occasion. In *United States v. Carson*, the court recognized the defendant's rape of the victim as evidence that the defendant's conduct led to sex acts performed by the victim. The rape sent the message that "'I control you and can do as I please.'" *United States v. Carson*, 870 at 600.

RCW 9A.40.100 does not require that the State prove that any sexual act actually occurred. Because the statute employs the future tense, the sex act is not an element of the offense. *United States v. Maynes*, 880 F.3d 110, 114 (4th Cir. 2018). The offender completes the crime when he recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits a person knowing, or in reckless disregard thereof, that means of force, fraud, or coercion of such means will be used to cause the person to engage in a commercial sex act. *United States v. Maynes*, 880 F.3d 110, 114 (4th Cir. 2018). A defendant commits the crime of trafficking even if the commercial sex act comes in the future as long as he knew that force, fraud, or coercion would be employed to cause the victim to engage in the act. *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010). Lars Braun recruited, enticed, harbored, transported, advertised, and maintained Jane while knowing that he and others would impose force, coercion, and fraud on her for her sexual favors.

*United States v. Carson*, 870 F.3d 584 (7th Cir. 2017), earlier reviewed, answers Lars Braun's contention that the State failed to prove causation. McKenzie Carson also

43

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*

argued that the evidence did not support a finding that the women engaged in commercial

sex due to force.  The court replied:

> No rational person could witness such force and coercion, let alone
> inflict it himself, without knowing or recklessly disregarding the fact that
> the threats and force of threats and coercion, or any combination of them,
> caused these women to engage in commercial sex acts.

*United States v. Carson*, 870 F.3d at 594.

### Vagueness

Lars Braun next contends that, if this court applies a definition of "force" in RCW

9A.40.100 that includes emotional manipulation, the statute becomes unconstitutionally

vague as applied.  Because we do not adopt any definition of force that includes

nonphysical force, we need not address this contention.

### Promotion of Prostitution

Lars Braun requests reversal of his conviction for promoting prostitution in the

first degree because the State presented insufficient evidence that he used "threat or

force" to induce Jane into prostitution, as required by RCW 9A.88.070.  RCW 9A.88.070

governs first degree promoting prostitution.  The statute reads, in relevant part:

> (1) A person is guilty of promoting prostitution in the first degree if
> he or she knowingly advances prostitution:
> (a) By compelling a person by *threat or force* to engage in
> prostitution or profits from prostitution which results from such threat or
> force.

(Emphasis added.)  RCW 9A.04.110 defines "threat:"

44

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*

(28) "Threat" means to communicate, directly or indirectly the intent:

(a) To cause bodily injury in the future to the person threatened or to any other person; or

(b) To cause physical damage to the property of a person other than the actor; or

(c) To subject the person threatened or any other person to physical confinement or restraint; or

. . . .

(j) To do any other act which is intended to harm substantially the person threatened or another with respect to his or her health, safety, business, financial condition, or personal relationships[.]

To prove a threat, the State need not present evidence of an explicit communicated threat. Threats can include nonverbal threats. *State v. Pinkney*, 2 Wn. App. 2d 574, 579, 411 P.3d 406 (2018).

The State's argument of sufficiency of evidence for promoting prostitution mirrors its contention in favor of affirming Lars Braun's guilt for human trafficking. According to the State, Braun employed threats of force and the withholding of food and drugs to prompt Jane to engage in acts of prostitution. On one occasion, he destroyed her property in order to gain control over her activities. For many of the same reasons that we rule that the evidence suffices to convict Braun of human trafficking, we hold that the evidence supports his conviction for promoting prostitution.

In *State v. Simon*, 64 Wn. App. 948, 831 P.2d 948 (1991), *aff'd in part, reversed in part on other grounds,* 120 Wn.2d 196, 840 P.2d 172 (1992), the court considered force applied by Simon to the victim, when she mentioned leaving him, sufficient for a

45

No. 37635-4-III
*State v. Braun*

conviction of promoting prostitution. A law enforcement officer also testified to the unwritten rules between a pimp and a prostitute whereby the latter receives physical punishment for leaving the pimp.

Appearance of Fairness

Lars Braun asserts that the trial judge violated the appearance of fairness doctrine when uttering comments from the bench. Before trial, the judge mentioned Governor Jay Inslee's order regarding COVID-19. Nevertheless, the trial judge gave everyone a choice of whether to wear a mask while in the courtroom. The court questioned the occurrence of the 1917 pandemic. Thereafter, the trial judge lamented the George Floyd protests in Seattle. After informing courtroom attendees that they need not obey the governor's order, the judge complained of anarchy and the lack of law. He ended by commenting that he had often pondered those subjects recently. Lars Braun argues that, based on the totality of the trial judge's statements, the judge viewed this case as an opportunity to reassert law and order during uncertain and chaotic times by convicting him.

All of the trial court's comments occurred before the court's ruling. Lars Braun did not object, before the trial court's verdict, to any impartiality of the judge. Nor does he claim manifest constitutional error on appeal. We recognize the peril of impugning a judge's impartiality while the case pends before him or her. Nevertheless, we question whether Braun preserved this challenge for appeal. The State, however, does not ask that we decline review of the issue.

46

No. 37635-4-III
*State v. Braun*

The federal and state constitutions guarantee a criminal defendant's right to be tried and sentenced by an impartial court. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22; *State v. Solis-Diaz*, 187 Wn.2d 535, 539, 387 P.3d 703 (2017). The law requires more than an impartial judge. The law demands that the judge also appear to be impartial pursuant to the appearance of fairness doctrine. *State v. Solis-Diaz*, 187 Wn.2d 535, 540 (2017). A judicial proceeding is valid if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing. *State v. Solis-Diaz*, 187 Wn.2d at 540. The party asserting a violation of the appearance of fairness must show a judge's actual or potential bias. *State v. Solis-Diaz*, 187 Wn.2d at 540. In determining a judge's impartiality, this court uses an objective test that assumes a reasonable observer knows and understands all the relevant facts. *State v. Solis-Diaz*, 187 Wn.2d at 540.

In *State v. Solis-Diaz*, 187 Wn.2d 535, 541 (2017), forwarded by Lars Braun, the Washington Supreme Court remanded to the trial court for resentencing before a different judge to determine whether Guadalupe Solis-Diaz should be considered for an exceptional mitigated sentence on the basis of Solis-Diaz's youth. The record reflected the trial court's frustration and unhappiness at the Court of Appeals requiring him to address anew whether Solis-Diaz should be considered for an exceptional downward sentence. The judge's remarks at the first resentencing strongly suggested that,

47

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*

regardless of the information presented in mitigation, he was committed to the original

standard range sentence of 1,111 months.

Lars Braun's trial judge never uttered any comments that showed prejudgment of

the guilt of Lars Braun. He never suggested that he wished to make an example out of

Lars Braun. He indicated no frustration in the state of the law being applied to the

prosecution. Despite complaining of Detective Maurice Washington's inability to be

present in Ellensburg, the trial judge granted Braun's motion to exclude Washington's

testimony on human trafficking. The judge also suggested that adults should be free to

make decisions without restraints from the government. We conclude that Braun has not

demonstrated the trial judge's actual or potential bias.

A judge's public comments on the administration of the criminal justice system

and rampant crime do not create reasonable cause for doubting the judge's partiality.

*United States v. Sevilla-Oyola*, 854 F. Supp. 2d 164, 167-68 (D.P.R. 2012), *vacated in*

*part*, 753 F.3d 309, *superseded on reh'g*, 770 F.3d 1 (1st Cir. 2014). To violate the

appearance of fairness doctrine, the judge's comments instead must directly relate to the

pending action. *In re Boston's Children First*, 244 F.3d 164, 168-69 (1st Cir. 2001).

Offender Score

The trial court sentenced Lars Braun with an offender score of one based on an

earlier conviction for possession of a controlled substance. Braun now contends that this

controlled substance conviction should not count toward his offender score in light of

48

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37635-4-III
*State v. Braun*

*State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). He requests resentencing with an offender score of zero. The State agrees.

In *State v. Blake*, 197 Wn.2d 170 (2021), the Washington high court held that Washington's strict liability drug possession statute, RCW 69.50.4013(1), violates due process under both the state and federal constitutions. The court found the statute unconstitutional and applied its ruling retroactively. Therefore, we accept the State's concession that Braun's conviction for possession of a controlled substance may not impact his offender score.

## CONCLUSION

We affirm Lars Braun's convictions for human trafficking and promoting prostitution. We remand for resentencing with an offender score of zero.

_____
Fearing, J.

WE CONCUR:

_____        _____
Pennell, C.J.                          Staab, J.

49